IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

FILED

AUG 2 6 2014

IN THIS OFFICE
Clerk U. S. District Court
Greensboro, N. C.

By ___

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | SUPERSEDING |
| | : | |
| v. | : | 1:14CR39-1 |
| | : | |
| CRAIG STANFORD EURY, JR. | : | |

The Grand Jury charges:

## COUNT ONE

### CONSPIRACY TO DEFRAUD THE UNITED STATES

#### BACKGROUND INFORMATION

1.   At all times material to this Indictment, INTERNATIONAL LABOR MANAGEMENT CORPORATION ("ILMC") was a corporation organized under the laws of the State of North Carolina with its headquarters and place of business in Vass, Moore County, North Carolina, in the Middle District of North Carolina.   At all times material herein, ILMC was in the business of preparing and submitting petitions on behalf of client companies to the United States government for temporary alien workers under the H-2B Visa program and the H-2A agricultural Visa program.

2.   At all times material to this Indictment, CRAIG STANFORD EURY, JR., was a resident of Moore County, North Carolina, in the Middle District of North Carolina.

3. At all times material to this Indictment, CRAIG STANFORD EURY, JR., held the primary ownership interest in ILMC. Prior to April 2008, CRAIG STANFORD EURY, JR., was the President of ILMC. CRAIG STANFORD EURY, JR., founded ILMC in 1994.

4. At all times material to this Indictment, CRAIG STANFORD EURY, JR., exercised control over the management and finances of ILMC. During the times material to this Indictment, CRAIG STANFORD EURY, JR., directed funds in excess of one million dollars to be withdrawn from the bank account of ILMC for his personal use and benefit.

5. At all times material to this Indictment, an individual whose initials are S.E.F. was a resident of Moore County, North Carolina, in the Middle District of North Carolina.

6. From April 2008 to the present, S.E.F. was and remains the President of ILMC. In this role, S.E.F. maintained and maintains her office and place of business at the offices of ILMC in Vass, Moore County, North Carolina, in the Middle District of North Carolina. Prior to April 2008, S.E.F. was the Vice President of Operations of ILMC, and worked under the direction of CRAIG STANFORD EURY, JR.

7. From April 2008 to the present, S.E.F., as President of ILMC, was and is responsible for the daily operations of

2

ILMC, which included and includes contact with ILMC client companies, supervision and training of ILMC employees in the preparation of H-2A Visa Petitions and preparation of H-2B Visa Petitions.

8. At all times material to this Indictment, the United States Department of Labor was an agency within the executive branch of the United States with the duty of enforcing the labor laws of the United States, including wage and hour laws and laws regarding the employment of temporary alien workers within the United States.

9. At all times material to this Indictment, United States Citizenship and Immigration Services ("USCIS"), as part of the Department of Homeland Security, was an agency within the executive branch of the government of the United States with the duty of enforcing and administering the immigration and citizenship programs of the United States, including the approval of H-2B Visas.

10. At all times material to this Indictment, the United States Department of State was an agency within the executive branch of the government of the United States with the duty of regulating the issuance of passports and visas for entry into the United States, including the issuance of H-2B Visas for the entry of alien temporary workers into the United States.

3

## THE H-2B VISA PROCESS

11. The H-2B non-agricultural worker program is administered by the United States Department of Labor and USCIS. The H-2B program allows United States employers to fill specific temporary non-agricultural jobs. For an employer to qualify for H-2B non-immigrant classification, thereby allowing foreign nationals to work for that employer, the employer is required to establish that:

    a. the need for the alien workers' services or labor is temporary, regardless of whether the underlying jobs can be described as permanent or temporary. The employer's need is considered temporary if it is a one-time need, a seasonal need, a peak load need, or an intermittent need;

    b. there is not a sufficient number of United States citizen workers who are able, willing, or qualified and available to do the temporary work; and

    c. the employment of H-2B alien workers will not adversely affect the wages and working conditions of similarly employed United States citizen workers.

12. The H-2B Visa program carries a statutory numerical limit, or "cap," which provides that no more than 66,000 aliens may be issued H-2B Visa classifications during any fiscal year.

13. Before requesting H-2B classification from USCIS, an employer seeking H-2B workers must first submit an Application

4

for Foreign Temporary Labor Certification, known as a Form ETA-750 (prior to January 2009), or as a Form ETA-9142 (after January 2009), to the Department of Labor. The completed ETA-750 or ETA-9142 must describe the number of jobs to be filled and the specific nature, dates and locations of the jobs that the H-2B workers will perform in the United States. The employer must demonstrate in the ETA-750 or ETA-9142 that it has conducted recruitment efforts in the geographical area of proposed employment and has not found United States citizen workers willing to perform the work set forth and described in the ETA-750 or ETA-9142 at the prevailing wage for that area. After review of the ETA-750 or ETA-9142, the Department of Labor issues a Final Determination Letter indicating whether an employer's application has been approved or denied. If approved, this certification may not be transferred to another employer.

14. Both the ETA-750 and the ETA-9142 require that the employer certify under penalty of perjury that the information provided is true and accurate. The Department of Labor relies on the factual accuracy of the ETA-750 and ETA-9142 in making the determination whether the application is approved or denied. In this regard, the Department of Labor relies on the signature of the employer certifying that the ETA-750 or ETA-9142 is true and accurate. The Department of Labor will not review or

5

approve an ETA-750 or ETA-9142 that is not certified by the employer under penalty of perjury.

15. After the Department of Labor has issued a Final Determination Letter certifying an employer for use of H-2B workers for specified jobs and job locations, the employer must submit a Form I-129, "Petition for Nonimmigrant Worker," with USCIS to obtain approval for issuance of H-2B Visas. As with the ETA-750 and ETA-9142, the Form I-129 requires the employer to describe the number of jobs to be filled, the number of H-2B Visas requested for alien temporary workers, and the specific nature and locations of the jobs that the H-2B workers will perform in the United States. The employer must attach the certified ETA-750 or ETA-9142 to the I-129 petition.

16. The Form I-129 requires that the employer certify under penalty of perjury that the information provided is true and accurate. USCIS relies on the factual accuracy of the Form I-129 in making the determination of whether the application is approved or denied. In this regard, USCIS relies on the signature of the employer certifying that the Form I-129 is true and accurate. USCIS will not review or approve a Form I-129 that is not certified by the employer under penalty of perjury.

17. Upon USCIS approval of a Form I-129, USCIS issues an approval notice informing the employer that its petition has

6

been approved and the H-2B Visas may be applied for at the United States Consulate.

18.   The actual H-2B Visa is issued to an alien worker after approval by the United States consulate just prior to entering the United States.   The H-2B Visa bears the following information:

a.   The name and picture of the alien worker;

b.   The I-129 petition number under which USCIS approved issuance of the H-2B Visa; and

c.   The name of the employer for which USCIS approved issuance of the H-2B Visa and for whom the client worker is authorized to enter the United States and work for at the location and the times set forth in the Form I-129 and approved by USCIS.

19.   H-2B workers who are already in the United States may change employers only if the new employer files a new Form I-129 for each worker with USCIS.   The H-2B workers may not begin work with new employers until new Forms I-129 are approved by USCIS authorizing the client workers to change employers.

20.   An employer who employs H-2B workers must notify USCIS if the employment for any H-2B worker ends more than thirty days before the end of the approved employment term.

21.   The H-2A agricultural worker program is administered by the United States Department of Labor and USCIS.   The H-2A

7

program is similar to the H-2B program for non-agricultural temporary workers in that it allows employers to obtain alien workers for specific temporary agricultural jobs. The application process for the H-2A program is generally similar to that of the H-2B program except that there is no cap on H-2A Visas.

22. The H-2A program also requires that the H-2A employer submit a Form I-129 to USCIS. Again, the Form I-129 in an H-2A case requires that the employer certify under penalty of perjury that the information provided is true and accurate. USCIS relies on the factual accuracy of a Form I-129 in making the determination of whether an H-2A application is approved or denied in the same manner as an H-2B application.

## OBJECTS OF THE CONSPIRACY

23. From the period beginning in or about December 2006, and continuing through the date of on or about April 1, 2013, the exact dates to the Grand Jurors unknown, in the County of Moore, in the Middle District of North Carolina, and elsewhere, CRAIG STANFORD EURY, JR., S.E.F., and divers other persons, both known and unknown to the Grand Jurors, knowingly and unlawfully combined, conspired and agreed together and with other persons:

a. To defraud the United States of America concerning one or more of its lawful government functions and rights, that is:

8

i. To defraud the United States by impeding, impairing and obstructing the lawful governmental function of the Department of Labor to administer, regulate and enforce the regulations and laws relating to the implementation of the H-2A and H-2B non-immigrant Visa programs;

ii. To defraud the United States by impeding, impairing and obstructing the lawful governmental functions of USCIS to administer, regulate and enforce violations, regulations and laws relating to the hiring, employment and presence of aliens in the United States;

iii. To defraud the United States by impeding, impairing and obstructing the lawful governmental function of the Department of Labor to ensure that American workers are not harmed by the entry of alien workers into the job market in the United States both in protecting the availability of jobs for United States Citizen workers and in ensuring the provision of fair wages for American workers; and

iv. To defraud the United States by impeding, impairing and obstructing the lawful governmental function of the State Department to monitor and regulate the issuance of H-2B Visas at United States consulates.

b. For the purpose of commercial advantage and private financial gain, to encourage and induce aliens to come, enter and reside in the United States, in knowing and in

9

reckless disregard of the fact that such coming to, entry and residence in the United States was in violation of federal law, to wit: Title 8, United States Code, Section 1324(a)(1)(A)(iv);

c. To use false and fraudulent means and to otherwise obtain, use and attempt to use H-2B Visas for entry into the United States by fraud, in violation of Title 18, United States Code, Section 1546(a).

d. To knowingly engage and attempt to engage in monetary transactions by and through a financial institution affecting interstate and foreign commerce in criminally derived property of a value greater than $10,000.00, being the proceeds of a specified illegal activity, that is, visa fraud, in violation of Title 18, United States Code, Section 1546(a), and inducing aliens to enter and reside in the United States in knowing and reckless disregard that such entry and residence was in violation of federal law, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iv), all in violation of Title 18, United States Code, Section 1957.

### MANNERS AND MEANS OF THE CONSPIRACY

24. At all times during the conspiracy, CRAIG STANFORD EURY, JR., and S.E.F. did direct and control the operations of ILMC. This direction included instructing ILMC employees on the H-2A and H-2B Visa application process and the preparation of Department of Labor and USCIS forms and petitions.

10

25. It was a further part of the conspiracy that CRAIG STANFORD EURY, JR., directly profited from the operations of ILMC. Between in or about November 2009 and on or about October 15, 2012, CRAIG STANFORD EURY, JR., directed that ILMC disburse $1,120,000.00 to him for his personal use and benefit.

26. It was a further part of the conspiracy that CRAIG STANFORD EURY, JR., and S.E.F., through ILMC, falsely petitioned for and obtained extra H-2B Visas above and beyond the actual needs of their client employers for the purpose of creating pools of extra Visas. CRAIG STANFORD EURY, JR., and S.E.F. falsely obtained and used such falsely obtained extra H-2B Visas for the financial benefit of ILMC, CRAIG STANFORD EURY, JR., and S.E.F. by fraudulently allowing employers who could not otherwise obtain H-2B Visas due to the operation of the cap to use H-2B Visas to bring alien workers into the United States under the pretense they were going to work for the employers for whom the H-2B Visas had been approved, and by allowing ILMC to obtain H-2B Visas prior to the cap being reached, thereby denying such H-2B Visas to other employers or competing agents.

27. It was a further part of the conspiracy that CRAIG STANFORD EURY, JR., and S.E.F., through ILMC, falsely and fraudulently represented to the Department of Labor and USCIS that their client employers had jobs for H-2B workers in greater numbers than actually needed by the client employers.

11

28. It was a further part of the conspiracy that CRAIG STANFORD EURY, JR., and S.E.F., through ILMC, falsely and fraudulently instructed clients that they needed to petition for H-2B Visas above and beyond their actual needs to ensure that they would be approved for the excess H-2B Visas, which CRAIG STANFORD EURY, JR., and S.E.F., through ILMC, would then fraudulently use to enter alien workers into the United States for other client employers or otherwise use to benefit themselves.

29. It was a further part of the conspiracy that CRAIG STANFORD EURY, JR., and S.E.F. caused ILMC to charge client employers based on ranges of numbers of H-2B Visas sought rather than actual numbers sought (for example, billing one charge for petitions for between one and ten Visas rather than billing for seven individual Visas), thereby encouraging client employers to seek more H-2B Visas than necessary and to petition for numbers of H-2B Visas in excess of their actual needs.

30. It was a further part of the conspiracy that S.E.F., through ILMC, instructed client employers to represent to the Department of Labor and USCIS that jobs for H-2B workers began at times different from those times that the workers would actually be needed, thereby allowing ILMC to seek H-2B Visas prior to the cap being reached and denying H-2B Visas to

12

employers setting forth accurate start dates in their H-2B Visa petitions.

31. It was a further part of the conspiracy that S.E.F. agreed with an ILMC client whose initials are S.P. that the client would create "winter companies" that could obtain H-2B Visas under the pretense that workers were needed for winter seasonal jobs, such as snowmakers. These "winter companies," however, were actually created for the purpose of obtaining H-2B Visas prior to the cap being reached and thereby facilitating the admission of alien workers into the United States in order to work in other spring and summer jobs.

32. It was a further part of the conspiracy that S.E.F. falsely instructed at least one client employer that it could obtain alien workers by falsely claiming that such workers were needed for agricultural work, thereby obtaining H-2A Visas to avoid the H-2B cap. S.E.F. further instructed this client employer that the client employer could then employ those H-2A workers in H-2B positions.

33. It was a further part of the conspiracy that S.E.F. directed ILMC employees to prepare false petitions for H-2A workers, knowing that the need of the client employers for H-2A Visas was merely a ruse and pretense to obtain entry for alien workers into the United States in order to take H-2B employment positions.

13

34. It was a further part of the conspiracy that S.E.F., through ILMC, prepared and caused to be prepared false and fraudulent Forms I-129 purporting to "change" employers for alien workers admitted into the United States under H-2A Visas, although those alien workers had in fact never worked in H-2A positions, as S.E.F. then well knew, and had been admitted to the United States for H-2B employers under the false pretense that the alien workers were needed for H-2A jobs.

35. It was a further part of the conspiracy that CRAIG STANFORD EURY, JR., and S.E.F., through ILMC, did prepare and file Forms I-129 with false and misleading job descriptions for the purpose of inducing USCIS to approve H-2B Visa petitions.

36. It was a further part of the conspiracy that CRAIG STANFORD EURY, JR., and S.E.F., through ILMC, used extra Visas obtained over and above the needs of employers by providing Visas to other client employers who were not able to obtain H-2B Visas due to the operation of the cap.

37. It was a further part of the conspiracy that CRAIG STANFORD EURY, JR., and S.E.F., through ILMC, did instruct alien workers to cross into the United States under the pretense that said workers would be working for client employers under whose names the "extra" H-2B Visas had been obtained, when, in fact, as CRAIG STANFORD EURY, JR., and S.E.F. then well knew, the alien workers would be working with different client employers,

14

all in reckless disregard that those alien workers would be working in violation of their H-2B Visas and in violation of law.

38. It was a further part of the conspiracy that CRAIG STANFORD EURY, JR., and S.E.F., through ILMC and its employees, did falsely and fraudulently inform client employers that it was legal for alien workers to be admitted into the United States as working for the client employers under whose names the extra H-2B Visas had been obtained if the alien workers worked for a token period of two weeks for said client employers.

39. CRAIG STANFORD EURY, JR., and S.E.F. encouraged the practice described in Paragraph 37-38 for the purpose of creating records that alien workers had worked at the original petitioning client employers, thereby misleading the Department of Labor and USCIS that the alien workers had been admitted into the United States to work at their documented employment locations, when CRAIG STANFORD EURY, JR., and S.E.F. intended at all times to have those alien workers admitted to the United States for other employers who were legally barred from obtaining H-2B Visas by operation of the cap.

40. It was a further part of the conspiracy that S.E.F. and ILMC employees acting at her direction, for the purpose of misleading the Department of Labor and USCIS, did instruct and encourage client employers to create false and fraudulent

15

payroll records reflecting that alien workers had actually worked with employers under whose names H-2B Visas had been obtained and pursuant to which those alien workers were admitted into the United States.

41. It was a further part of the conspiracy that S.E.F. and ILMC employees acting at her direction did instruct and encourage client employers receiving alien workers who were admitted into the United States under H-2B Visas of other employers to reimburse the employers under whose names the workers had been admitted to the United States for the costs of employing alien workers for two weeks.

42. It was a further part of the conspiracy that CRAIG STANFORD EURY, JR., and S.E.F., through ILMC and its employees, did file false and fraudulent Forms I-129 seeking changes of employers for H-2B workers fraudulently admitted to the United States under the H-2B Visas of other employers, thereby falsely representing that the workers were changing employers, when, in fact, as CRAIG STANFORD EURY, JR., and S.E.F. then well knew, the alien workers had not worked for the original employers or had only worked for those employers for token periods to mislead USCIS and the Department of Labor. CRAIG STANFORD EURY, JR., S.E.F. and ILMC employees acting at their direction filed these false and fraudulent petitions as a pretense to mislead the Department of Labor and USCIS and to conceal the fact that the

16

workers had been admitted into the United States under the original employers' H-2B Visas in violation of law. CRAIG STANFORD EURY, JR., S.E.F. and ILMC employees acting at their direction then charged the new employers for filing the "change" petitions, thereby allowing ILMC to profit twice by filing additional petitions for the same alien workers.

43. It was a further part of the conspiracy that CRAIG STANFORD EURY, JR., and S.E.F., through ILMC, required that client employers provide CRAIG STANFORD EURY, JR., or S.E.F. with permission to sign their officers' names to various documents required to be filed in the H-2A and H-2B application process, including Department of Labor documents and Forms I-129. CRAIG STANFORD EURY, JR., and S.E.F. did not inform client employers that CRAIG STANFORD EURY, JR., S.E.F. or an ILMC employee operating at their direction would place false signatures of the officers of client employers onto certifications made under the penalty of perjury, thereby falsely representing to the Department of Labor and USCIS that the officers had reviewed the documents and certified that they were accurate under penalty of perjury.

44. It was a further part of the conspiracy that CRAIG STANFORD EURY, JR., S.E.F. and ILMC employees acting at their direction placed the false signatures of the names of officers of client employers onto certifications made under the penalty

17

of perjury on Forms I-129, thereby falsely representing to the Department of Labor and USCIS that the petitions had been certified to be factually accurate by the petitioning employers, when, in fact, as CRAIG STANFORD EURY, JR., and S.E.F. then well knew, those client employers had not reviewed the petitions and the petitions often contained false and fraudulent representations, including inflated numbers of workers needed, false job start dates, incorrect job descriptions and inaccurate rates of pay and benefits.

45. It was a further part of the conspiracy that CRAIG STANFORD EURY, JR., S.E.F. and ILMC employees acting at their direction placed false signatures of the officers of client employers onto certifications on Forms I-129 made under the penalty of perjury when the officers had not given permission to sign the officers' names.

46. It was a further part of the conspiracy that CRAIG STANFORD EURY, JR., S.E.F. and ILMC employees acting at their direction failed to provide client employers with copies of Forms I-129 filed and prepared on their behalf by ILMC, even when client employers requested copies of the Forms I-129 for their records.

47. It was a further part of the conspiracy that CRAIG STANFORD EURY, JR., S.E.F. and ILMC employees acting at their direction instructed client employers how to conduct interviews

18

for United States citizen workers in such a manner as to suppress the hiring of United States citizen workers, thereby allowing ILMC to profit from filling the jobs with H-2B workers while depriving United States citizen workers of the opportunity to secure those jobs.

48. It was a further part of the conspiracy that S.E.F. and ILMC instructed client companies to hire token United States citizen workers to appear to be engaged in the good faith hiring of United States citizen workers.

OVERT ACTS

49. To accomplish the objects of the conspiracy, CRAIG STANFORD EURY, JR., S.E.F. and others performed and caused to be performed the following overt acts in Moore County, in the Middle District of North Carolina, and elsewhere.

50. On or about June 28, 2006, CRAIG STANFORD EURY, JR., filed, or caused the filing of by employees of ILMC, a Form I-129, petition number EAC-07-062-52723, for 110 H-2B Visas on behalf of Best Landscape, LLC, Myrtle Beach, South Carolina, such petition bearing the false signature and certification of an officer of Best Landscape, LLC, whose initials are W.T.

51. On or about January 15, 2007, CRAIG STANFORD EURY, JR., filed, or caused the filing of by employees of ILMC, a Form I-129, petition number EAC-07-102-52319, for eighty H-2B Visas on behalf of Landscape Maintenance, LLC, Savannah, Georgia, such

19

petition bearing the false signature and certification of an officer of Landscape Maintenance, LLC, whose initials are W.T.

52. On or about January 29, 2007, CRAIG STANFORD EURY, JR., filed, or caused the filing by employees of ILMC, a Form I-129, petition number EAC-07-081-52003, for ten H-2B Visas on behalf of Sunland Fire Protection, Inc., such petition bearing the false signature and certification of an officer of Sunland Fire Protection, Inc., whose initials are R.S., and such petition falsely representing that jobs existed for landscape workers, when in fact Sunland Fire Protection, Inc., employed no landscape workers and was seeking employees to work as pipe-fitters at a higher rate of pay than that represented on the Form I-129.

53. On or about January 29, 2007, CRAIG STANFORD EURY, JR., also filed, or caused the filing by employees of ILMC, a separate Form I-129, petition number EAC-07-082-50914, for ten H-2B Visas on behalf of Sunland Fire Protection, Inc., such petition bearing the false signature and certification of an officer of Sunland Fire Protection, Inc., whose initials are R.S., and such petition falsely representing that jobs existed for landscape workers, when in fact Sunland Fire Protection, Inc., employed no landscape workers and was seeking employees to work as pipe-fitters at a higher rate of pay than represented on the Form I-129.

20

54. On or about April 1, 2008, S.E.F. instructed an ILMC client whose initials are M.M. that he could avoid the operation of the H-2B Visa cap and obtain workers for Miller's Restaurant in Kill Devil Hills, North Carolina, by petitioning for H-2A agricultural Visas for restaurant workers under the pretense that they were needed for agricultural work at a hunting farm in Fairfield, North Carolina, owned by Loumac, LLC. S.E.F. advised M.M. that the alien workers could then be transferred to H-2B Visas once they had entered the United States under the pretense that they were needed for farm work.

55. On or about April 2, 2008, S.E.F. filed, or caused the filing of by employees of ILMC, a Form ETA-750 on behalf of Loumac, LLC, falsely stating that ten jobs existed for alien workers at the Loumac, LLC, farm in Fairfield, North Carolina, when in fact the intent was to obtain H-2A Visas to allow workers to enter the United States, not for agricultural work, but for work in a restaurant.

56. On or about April 22, 2008, S.E.F. filed, or caused the filing of by employees of ILMC, a Form I-129, petition number WAC-08-144-54538, for ten H-2A Visas on behalf of Loumac, LLC, under the false pretense that such H-2A Visas were needed for alien workers at the Loumac, LLC, farm in Fairfield, North Carolina, when, in fact, the alien workers were never intended to work at the farm.

21

57. On or about May 18, 2008, S.E.F., or an ILMC employee acting at her direction, instructed M.M. that the alien workers who entered the United States under the H-2A Visas falsely obtained through petition number WAC-08-144-54538 did not have to report to the Loumac, LLC, farm in Fairfield, North Carolina, but could instead immediately begin work in Kill Devil Hills, North Carolina, at Miller's Restaurant in disregard of their status as H-2A agricultural workers.

58. On or about June 3, 2008, S.E.F. filed, or caused the filing of by employees of ILMC, a Form I-129, petition number EAC-08-171-52508, on behalf of Miller's Restaurant falsely stating that the alien workers who entered the United States under H-2A Visas obtained under I-129 petition WAC-08-144-54538 were "changing" employers to Miller's Restaurant, when, in fact, those alien workers had never worked as farm workers and had been working out of visa status at Miller's Restaurant since entering the United States under the pretense that they were H-2A agricultural workers.

59. On or about April 28, 2008, S.E.F. directed that five alien workers enter the United States using "extra" Visas obtained for Carefree Service Company, Boone, North Carolina, under the pretense that they were intended to work for Carefree Service Company in Boone, North Carolina, when, in fact, they were intended to work for Southeast Woodland Service, Inc., in

22

Conway, South Carolina, which company was then barred by operation of the cap from obtaining H-2B Visas. S.E.F. further directed that the alien workers proceed to work for Southeast Woodland Services, Inc., after working for a token two-week period at Carefree Services Company to create the impression that the workers had actually entered the United States to work at Carefree Service Company.

60. On or about July 10, 2008, S.E.F. filed, or caused the filing of by employees of ILMC, a Form I-129, petition number EAC-08-173-51883, on behalf of Southeast Woodland Service, Inc., falsely stating that five alien workers who entered the United States under "extra" H-2B Visas obtained for Carefree Service Company were "changing" employers to Southeast Woodland Services, Inc., when, in fact, they had entered the United States for the purpose of working for Southeast Woodland Services, Inc.

61. On or about July 18, 2008, S.E.F. filed, or caused the filing by employees of ILMC, a form I-129 petition, petition EAC-08-206-51398, for eighteen H-2B Visas on behalf of Sunland Fire Protection, Inc., such petition bearing the false signature and certification of an officer whose initials are R.S. and falsely representing that jobs existed for landscape workers, when in fact Sunland Fire Protection, Inc., employed no landscape workers and was seeking employees to work as pipe-

23

fitters at a higher rate of pay than represented on the I-129 petition.

62. In or about June or July 2008, S.E.F. met with an ILMC client whose initials are S.P. to discuss the creation of "winter companies" to allow S.P. and ILMC to bring alien workers into the United States prior to the operation of the cap. To achieve this goal, S.P. created a "winter" company, Winterscapes, LLC, in Boone, North Carolina.

63. In or about June or July 2008, S.P. contacted S.E.F. to determine how many H-2B Visas he could request for Winterscapes, LLC, for the purpose of entering alien workers into the United States prior to the operation of the cap. S.E.F. instructed S.P. that he could request as many workers as he wanted, as Winterscapes, LLC, was a start-up company. S.E.F. did not inform S.P. that he could only legally petition for alien workers that were actually needed for specific positions at Winterscapes, LLC, and which could not be filled with United States citizen workers. Based on S.E.F.'s instructions, S.P. requested that ILMC petition for 150 snowmakers despite the fact that S.P. knew that jobs in North Carolina only existed for approximately twenty-five snowmakers.

64. On or about July 8, 2008, S.E.F. filed, or caused the filing of by employees of ILMC, a Form I-129, petition number EAC-08-196-51524, which petition falsely stated that

24

Winterscapes, LLC, Boone, North Carolina, had jobs for 150 alien workers as snowmakers, such petition bearing the false signature and certification of an officer of Winterscapes, LLC, whose initials are S.P. S.E.F. knew at the time of the filing of the above petition that the large majority of the "snowmakers" would be used to work at other jobs once they entered the United States under H-2B Visas obtained for Winterscapes, LLC.

65. On or about December 16, 2008, S.E.F. filed, or caused the filing of by employees of ILMC, a Form I-129, petition number EAC-09-057-51033, for ten H-2B Visas on behalf of Arbor Lawns, Inc., Orchard Park, New York, such petition bearing the false signature and certification of an officer of Arbor Lawns, Inc., whose initials are G.B., and falsely claiming that Arbor Lawns, Inc., needed ten alien workers, when, in fact, the company had need for only three alien workers.

66. On or about March 24, 2009, S.E.F., or an ILMC employee acting at her direction, directed that three alien workers enter the United States using "extra" Visas obtained for Arbor Lawns, Inc., Orchard Park, New York, without the knowledge of such company, under the pretense that they were intended to work for Arbor Lawns, Inc., in Orchard Park, New York, as landscape workers, when, in fact, they were intended to work for R.H. Loven Company as concrete plant workers in Pineola, North Carolina, which company was then barred by operation of the cap

25

from obtaining H-2B Visas. S.E.F., or an ILMC employee acting at her direction, further directed that the alien workers proceed directly to Pineola, North Carolina, without working for Arbor Lawns, Inc., in Orchard Park, New York.

67. On or about March 24, 2009, S.E.F., or an ILMC employee acting at her direction, directed that an alien enter the United States using an "extra" Visa obtained for Arbor Lawns, Inc., Orchard Park, New York, without the knowledge of such company, under the pretense that the alien worker was intended to work for Arbor Lawns, Inc., in Orchard Park, New York, as a landscape worker, when, in fact, the alien worker was intended to work as a hotel worker for Harborside Motel in Ocracoke, North Carolina, which company was then barred by operation of the cap from obtaining H-2B Visas. S.E.F., or an ILMC employee acting at her direction, further directed that the worker proceed directly to Ocracoke, North Carolina, without working for Arbor Lawns, Inc., in Orchard Park, New York.

68. On or about March 1, 2009, S.E.F. instructed an officer of Silverwater Traders, LLC, in Ocracoke, North Carolina, whose initials are K.S., that Silverwater Traders, LLC, could use an H-2B Visa obtained in its name to bring an alien worker to the United States under the pretense that the alien worker would work at Silverwater Traders, LLC, when the

26

worker was actually intended to work at Harborside Motel in Ocracoke, North Carolina.

69. On or about March 1, 2009, S.E.F. instructed K.S. that Harborside Motel could reimburse Silverwater Traders, LLC, for the expenses of bringing the alien worker into the United States for the benefit of Harborside Motel.

70. On or about March 24, 2009, S.E.F., or an ILMC employee acting at her direction, directed that an alien enter the United States using an "extra" Visa obtained for Silverwater Traders, LLC, in Ocracoke, North Carolina, under the pretense that the alien worker was intended to work for Silverwater Traders, LLC, when, in fact, the alien worker was intended to work as a hotel worker for Harborside Motel in Ocracoke, North Carolina, which company was then barred by operation of the cap from obtaining H-2B Visas. S.E.F. further directed that the alien worker proceed to work for Harborside Motel after working for a token two-week period at Silverwater Traders, LLC, to create the impression that the worker had actually entered the United States to work at Silverwater Traders, LLC.

71. On or about March 26, 2009, S.E.F. filed, or caused the filing of by employees of ILMC, a Form I-129, petition number EAC-09-124-50363, on behalf of Best Landscape, Inc., Myrtle Beach, South Carolina, falsely stating that sixty-six alien workers who entered the United States under H-2B Visas

27

obtained for Winterscapes, LLC, Boone, North Carolina, under the pretense that they would be working as snowmakers at North Carolina ski resorts, were "changing" employers to Best Landscape, Inc., to work as landscape workers, when, in fact, the alien workers had entered the United States for the purpose of working for Best Landscape, Inc., and had either never worked for Winterscapes, LLC, as snowmakers in North Carolina or had worked for Winterscapes, LLC, for only a token period.

72. On or about April 17, 2009, S.E.F. filed, or caused the filing of by employees of ILMC, a Form I-129, petition number EAC-09-141-53289, on behalf of Harborside Motel, Ocracoke, North Carolina, falsely stating that an alien worker who entered the United States under an "extra" H-2B Visa obtained for Silverwater Traders was "changing" employers to Harborside Motel, Ocracoke, North Carolina, when, in fact, the alien worker had entered the United States for the sole purpose of working for Harborside Motel and had worked for Silverwater Traders only for a token period for which Harborside Motel had reimbursed Silverwater Traders.

73. On or about June 8, 2009, S.E.F. communicated by e-mail with an officer of R.H. Loven Company whose initials are J.L. and informed J.L. that "there was a transfer in the works from another one of our H-2B clients, Arbor Lawns, to your company." S.E.F. further informed J.L. in the e-mail that the

28

"transfer" had not gone through and that R.H. Loven Company could only legally employ the three alien workers provided to them by ILMC if a "transfer" was filed with USCIS. S.E.F. further informed J.L. that R.H. Loven Company would need to submit two weeks of payroll evidence showing that the three alien workers had actually worked for Arbor Lawns for no less than two weeks. S.E.F. further advised J.L. that she could put J.L. in touch with Arbor Lawns, Inc.

74. On or about June 8, 2009, S.E.F. and J.L. had a conversation by telephone. S.E.F. suggested to J.L. that R.H. Loven Company and Arbor Lawns, Inc., could reach an arrangement in which R.H. Loven Company would transfer funds to Arbor Lawns, Inc., for payroll for the alien workers so that Arbor Lawns, Inc., could then issue payroll checks to the alien workers, thereby creating the pretense that the alien workers were employed by Arbor Lawns, Inc.

75. On or about July 8, 2008, S.E.F. filed, or caused the filing of by employees of ILMC, a Form I-129, petition number EAC-09-201-51107, which petition falsely stated that Winterscapes, LLC, Boone, North Carolina, had jobs for 246 alien workers as janitors, such petition bearing the false signature and certification of an officer of Winterscapes, LLC, whose initials are S.P. S.E.F. knew at the time of the filing of the above petition that the majority of the "janitors" would be used

29

to work at other jobs once they entered the United States under H-2B Visas obtained for Winterscapes, LLC.

76. Following approval of the Waterscapes, LLC, Form I-129, petition number EAC-09-201-51107, S.P. contacted S.E.F. and informed her that he did not have need for the majority of the 246 H-2B Visas obtained under that petition. S.P. asked S.E.F. if the unneeded H-2B Visas could be returned to USCIS. S.E.F. informed S.P. that there was no procedure for return of H-2B Visas. S.E.F. did not contact USCIS to inform the United States that a Form I-129, petition number EAC-09-201-51107 had contained an inflated request for H-2B Visas.

77. On or about June 8, 2009, S.E.F. contacted an officer of Arbor Lawns, Inc., whose initials are J.B., by telephone and requested that J.B. allow R.H. Loven Company to use "extra" Arbor Lawn H-2B Visas to bring workers into the United States. After being told by J.B. that Arbor Lawns, Inc., did not consent to the use of any "extra" Arbor Lawn H-2B Visas by R.H. Loven Company, S.E.F. requested that J.B. speak with a representative of R.H. Loven Company directly. The officers of Arbor Lawns, Inc., were unaware of the existence of "extra" Arbor Lawn H-2B Visas prior to S.E.F.'s telephone call to J.B.

78. In or about June or July 2009, the officers of Arbor Lawns, Inc., and R.H. Loven Company agreed not to enter into an arrangement to make it appear that the three alien workers

30

provided to R.H. Loven Company under H-2B Visas issued to Arbor Lawns, Inc., had actually worked at Arbor Lawns, Inc. Thereafter, R.H. Loven Company directed the three alien workers to return to Mexico.

79. On or about August 7, 2009, S.E.F. informed J.L. at R.H. Loven Company by e-mail that USCIS had not issued all of the 66,000 H-2B Visas for fiscal year 2009 and therefore H-2B Visas were available for employers. Also on or about August 7, 2009, J.L. responded by e-mail to S.E.F. and requested that S.E.F. "[p]lease apply for the three that we had to send back to Mexico to return ASAP."

80. On or about August 13, 2009, S.E.F., after being instructed by J.L. to petition for three alien workers on behalf of R.H. Loven Company, Pineola, North Carolina, filed, or caused the filing of by employees of ILMC, a Form I-129, petition number EAC-09-222-50165, which petition falsely stated that R.H. Loven Company had jobs for ten alien workers and falsely requesting that ten H-2B Visas be issued, such petition bearing the false signature and certification of an officer of R.H. Loven Company whose initials are R.L.

81. On or about July 9, 2009, S.E.F. filed, or caused the filing of by employees of ILMC, a Form I-129, petition number EAC-09-199-51795, on behalf of Southeast Woodland Service, Inc., Conway, South Carolina, falsely stating that five alien workers

31

who entered the United States under "extra" H-2B Visas obtained for Woods Plus, Inc., in Lugoff, South Carolina, were "changing" employers to Southeast Woodland Services, Inc., when, in fact, they had entered the United States for the purpose of working for Southeast Woodland, Services, Inc., and had worked only for a token period at Woods Plus, Inc.

82. On or about December 16, 2008, S.E.F. filed, or caused the filing of by employees of ILMC, a Form I-129, petition number EAC 09-057-50983, for thirty-eight H-2B Visas on behalf of Enviro-Scapes, LLC, Nashville, Tennessee, such petition bearing the false signature and certification of an officer of Enviro-Scapes, LLC, whose initials are M.R., and falsely claiming need of thirty-eight alien workers, when, in fact, the company had need of fewer than thirty alien workers and could not employ or house alien workers in excess of thirty.

83. On or about January 8, 2010, S.E.F. filed, or caused the filing of by employees of ILMC, a Form I-129, petition number EAC-10-067-51294, for thirty-two H-2B Visas on behalf of Enviro-Scapes, LLC, Nashville, Tennessee, such petition bearing the false signature and certification of an officer of Enviro-Scapes, Inc., whose initials are M.R., and falsely claiming need of thirty-two alien workers, when, in fact, the company had need of fewer than thirty alien workers and could not employ or house alien workers in excess of thirty.

32

84. On or about January 14, 2011, S.E.F. filed, or caused the filing of by employees of ILMC, a Form I-129, petition number EAC-11-075-50220, for thirty-four H-2B Visas on behalf of Enviro-Scapes, LLC, Nashville, Tennessee, such petition bearing the false signature and certification of an officer of Enviro-Scapes, Inc., whose initials are M.R., and falsely claiming need of thirty-four alien workers, when, in fact, the company had need of fewer than thirty alien workers and could not employ or house alien workers in excess of thirty.

85. On or about March 14, 2012, S.E.F. filed, or caused the filing of by employees of ILMC, a Form I-129, petition number EAC-12-111-51257, for thirty-five H-2B Visas on behalf of Enviro-Scapes, LLC, Nashville, Tennessee, such petition bearing the false signature and certification of an officer of Enviro-Scapes, LLC, whose initials are M.R., and falsely claiming need of thirty-five alien workers, when, in fact, the company had need of fewer than thirty alien workers and could not employ or house alien workers in excess of thirty.

86. On or about February 7, 2013, S.E.F. filed, or caused the filing of by employees of ILMC, a Form I-129, petition number EAC-13-088-51105, for thirty-five H-2B Visas on behalf of Enviro-Scapes, LLC, Nashville, Tennessee, such petition bearing the false signature and certification of an officer of Enviro-Scapes, LLC, whose initials are M.R., and falsely claiming need

33

of thirty-five alien workers, when, in fact, the company had need of fewer than thirty alien workers and could not employ or house alien workers in excess of thirty.

87. During the course of the conspiracy, CRAIG STANFORD EURY, JR., directed employees of ILMC to disburse funds directly to him for his personal use and benefit, including the funds derived from the conspiracy to defraud the United States, fraudulently obtain H-2B Visas, and encourage the entry into and residence of aliens in the United States in knowing and reckless disregard that such entry and residence was in violation of law. CRAIG STANFORD EURY, JR., directed ILMC employees to disburse ILMC funds to him on the following dates and in the following amounts:

| 11/20/2009 | $70,000 |
| 3/15/2010 | $100,000 |
| 9/30/2010 | $100,000 |
| 12/30/2010 | $200,000 |
| 6/21/2011 | $100,000 |
| 10/27/2011 | $200,000 |
| 6/20/2012 | $150,000 |
| 8/20/2012 | $100,000 |
| 10/15/2012 | $100,000 |
| Total | $1,120,000 |

34

All in violation of Title 8, United States Code, Sections 1324(a)(1)(A)(v)(I), and Title 18, United States Code, Sections 371 and 2.

## COUNT TWO

1. Paragraphs 1 through 87 of Count One are hereby re-alleged and incorporated by reference as if fully set forth herein.

2. On or about November 24, 2009, in the County of Moore, in the Middle District of North Carolina, and elsewhere, CRAIG STANFORD EURY, JR., did knowingly engage and attempt to engage in a monetary transaction by and through a financial institution affecting interstate and foreign commerce in criminally derived property of a value greater than $10,000.00, that is, the deposit of a check, ILMC check number 15674 in the amount of $70,000.00, into Branch Banking and Trust checking account number 0005290834386, in the name of Craig Stanford Eury, Jr., such property having been derived from a specified unlawful activity, to wit: visa fraud, in violation of Title 18, United States Code, Section 1546(a), and inducing aliens to enter and reside in the United States in knowing and reckless disregard that such entry and residence was in violation of the law, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iv).

35

All in violation of Title 18, United States Code, Sections 1957 and 2.

## COUNT THREE

1.     Paragraphs 1 through 87 of Count One are hereby re-alleged and incorporated by reference as if fully set forth herein.

2. On or about March 18, 2010, in the County of Moore, in the Middle District of North Carolina, and elsewhere, CRAIG STANFORD EURY, JR., did knowingly engage and attempt to engage in a monetary transaction by and through a financial institution affecting interstate and foreign commerce in criminally derived property of a value greater than $10,000.00, that is, the deposit of a check, ILMC check number 16073 in the amount of $100,000.00, into Branch Banking and Trust checking account number 0005290834386, in the name of Craig Stanford Eury, Jr., such property having been derived from a specified unlawful activity, to wit: visa fraud, in violation of Title 18, United States Code, Section 1546(a), and inducing aliens to enter and reside in the United States in knowing and reckless disregard that such entry and residence was in violation of the law, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iv).

All in violation of Title 18, United States Code, Sections 1957 and 2.

36

## COUNT FOUR

1.  Paragraphs 1 through 87 of Count One are hereby re-alleged and incorporated by reference as if fully set forth herein.

2. On or about October 6, 2010, in the County of Moore, in the Middle District of North Carolina, and elsewhere, CRAIG STANFORD EURY, JR., did knowingly engage and attempt to engage in a monetary transaction by and through a financial institution affecting interstate and foreign commerce in criminally derived property of a value greater than $10,000.00, that is, the deposit of a check, ILMC check number 16379 in the amount of $100,000.00, into Branch Banking and Trust checking account number 0005290834386, in the name of Craig Stanford Eury, Jr., such property having been derived from a specified unlawful activity, to wit: visa fraud, in violation of Title 18, United States Code, Section 1546(a), and inducing aliens to enter and reside in the United States in knowing and reckless disregard that such entry and residence was in violation of the law, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iv).

All in violation of Title 18, United States Code, Sections 1957 and 2.

37

## COUNT FIVE

1.    Paragraphs 1 through 87 of Count One are hereby re-alleged and incorporated by reference as if fully set forth herein.

2. On or about December 30, 2010, in the County of Moore, in the Middle District of North Carolina, and elsewhere, CRAIG STANFORD EURY, JR., did knowingly engage and attempt to engage in a monetary transaction by and through a financial institution affecting interstate and foreign commerce in criminally derived property of a value greater than $10,000.00, that is, the deposit of a check, ILMC check number 16510 in the amount of $200,000.00, into Branch Banking and Trust checking account number 0005290834386, in the name of Craig Stanford Eury, Jr., such property having been derived from a specified unlawful activity, to wit: visa fraud, in violation of Title 18, United States Code, Section 1546(a), and inducing aliens to enter and reside in the United States in knowing and reckless disregard that such entry and residence was in violation of the law, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iv).

All in violation of Title 18, United States Code, Sections 1957 and 2.

38

## COUNT SIX

1.    Paragraphs 1 through 87 of Count One are hereby re-alleged and incorporated by reference as if fully set forth herein.

2. On or about June 22, 2011, in the County of Moore, in the Middle District of North Carolina, and elsewhere, CRAIG STANFORD EURY, JR., did knowingly engage and attempt to engage in a monetary transaction by and through a financial institution affecting interstate and foreign commerce in criminally derived property of a value greater than $10,000.00, that is, the deposit of a check, ILMC check number 16979 in the amount of $100,000.00, into Branch Banking and Trust checking account number 0005290834386, in the name of Craig Stanford Eury, Jr., such property having been derived from a specified unlawful activity, to wit: visa fraud, in violation of Title 18, United States Code, Section 1546(a), and inducing aliens to enter and reside in the United States in knowing and reckless disregard that such entry and residence was in violation of the law, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iv).

All in violation of Title 18, United States Code, Sections 1957 and 2.

39

## COUNT SEVEN

1. Paragraphs 1 through 87 of Count One are hereby re-alleged and incorporated by reference as if fully set forth herein.

2. On or about November 2, 2011, in the County of Moore, in the Middle District of North Carolina, and elsewhere, CRAIG STANFORD EURY, JR., did knowingly engage and attempt to engage in a monetary transaction by and through a financial institution affecting interstate and foreign commerce in criminally derived property of a value greater than $10,000.00, that is, the deposit of a check, ILMC check number 17133 in the amount of $200,000.00, into Branch Banking and Trust checking account number 0005290834386, in the name of Craig Stanford Eury, Jr., such property having been derived from a specified unlawful activity, to wit: visa fraud, in violation of Title 18, United States Code, Section 1546(a), and inducing aliens to enter and reside in the United States in knowing and reckless disregard that such entry and residence was in violation of the law, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iv).

All in violation of Title 18, United States Code, Sections 1957 and 2.

40

## COUNT EIGHT

1. Paragraphs 1 through 87 of Count One are hereby re-alleged and incorporated by reference as if fully set forth herein.

2. On or about June 21, 2012, in the County of Moore, in the Middle District of North Carolina, and elsewhere, CRAIG STANFORD EURY, JR., did knowingly engage and attempt to engage in a monetary transaction by and through a financial institution affecting interstate and foreign commerce in criminally derived property of a value greater than $10,000.00, that is, the deposit of a check, ILMC check number 17760 in the amount of $150,000.00, into Branch Banking and Trust checking account number 0005290834386, in the name of Craig Stanford Eury, Jr., such property having been derived from a specified unlawful activity, to wit: visa fraud, in violation of Title 18, United States Code, Section 1546(a), and inducing aliens to enter and reside in the United States in knowing and reckless disregard that such entry and residence was in violation of the law, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iv).

All in violation of Title 18, United States Code, Sections 1957 and 2.

41

## COUNT NINE

1. Paragraphs 1 through 87 of Count One are hereby re-alleged and incorporated by reference as if fully set forth herein.

2. On or about August 21, 2012, in the County of Moore, in the Middle District of North Carolina, and elsewhere, CRAIG STANFORD EURY, JR., did knowingly engage and attempt to engage in a monetary transaction by and through a financial institution affecting interstate and foreign commerce in criminally derived property of a value greater than $10,000.00, that is, the deposit of a check, ILMC check number 17856 in the amount of $100,000.00, into Branch Banking and Trust checking account number 0005290834386, in the name of Craig Stanford Eury, Jr., such property having been derived from a specified unlawful activity, to wit: visa fraud, in violation of Title 18, United States Code, Section 1546(a), and inducing aliens to enter and reside in the United States in knowing and reckless disregard that such entry and residence was in violation of the law, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iv).

All in violation of Title 18, United States Code, Sections 1957 and 2.

42

## COUNT TEN

1.    Paragraphs 1 through 87 of Count One are hereby re-alleged and incorporated by reference as if fully set forth herein.

2. On or about October 18, 2012, in the County of Moore, in the Middle District of North Carolina, and elsewhere, CRAIG STANFORD EURY, JR., did knowingly engage and attempt to engage in a monetary transaction by and through a financial institution affecting interstate and foreign commerce in criminally derived property of a value greater than $10,000.00, that is, the deposit of a check, ILMC check number 17903 in the amount of $100,000.00, into Branch Banking and Trust checking account number 0005290834386, in the name of Craig Stanford Eury, Jr., such property having been derived from a specified unlawful activity, to wit: visa fraud, in violation of Title 18, United States Code, Section 1546(a), and inducing aliens to enter and reside in the United States in knowing and reckless disregard that such entry and residence was in violation of the law, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iv).

All in violation of Title 18, United States Code, Sections 1957 and 2.

## Forfeiture Allegations

1.    The allegations contained in Counts One through Ten of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 8, United States Code, Section 1324(b)(1), and Title 18, United States Code, Section 982(a).

2.    Pursuant to Title 8, United States Code, Section 1324(b)(1), upon conviction of an offense in violation of Title 8, United States Code, Section 1324(a), as alleged in Object Two of Count One [¶ 23.b.], the defendant shall forfeit to the United States of America any conveyance, including any vessel, vehicle, or aircraft, that has been or is being used in the commission of the violations of which the defendant is convicted, the gross proceeds of such violations, and any property traceable to such conveyance or proceeds.

3.    Pursuant to Title 18, United States Code, Section 982(a)(6), upon conviction of an offense in violation of Title 8, United States Code, Section 1324(a) or Title 18, United States Code, Section 1546, as alleged in Object Three of Count One [¶ 23.c.], defendant shall forfeit to the United States of America:

(i)    any conveyance, including any vessel, vehicle, or aircraft used in the commission of the offense of which the defendant is convicted; and

44

(ii) any property, real or personal--

                (A)     that constitutes, or is derived from or
                        is traceable to the proceeds obtained
                        directly    or    indirectly    from    the
                        commission of the offense of which the
                        defendant is convicted; or

                (B)     that  is  used  to  facilitate,  or  is
                        intended to be used to facilitate, the
                        commission of the offense of which the
                        defendant is convicted.

        4.    Pursuant  to  Title  18,  United  States  Code,  Section
982(a)(1), upon conviction of an offense in violation of Title
18, United States Code, Section 1957, as alleged in Object Four
of  Count  One  [¶  23.d.],  and  Counts  Two  through  Ten,  the
defendant  shall  forfeit  to  the  United  States  of  America  any
property,  real  or  personal,  involved  in  such  offense,  or  any
property traceable to such property.

        5.    The  property  to  be  forfeited  includes,  but  is  not
limited to, a sum of money equal to not less than $1,120,000.00
in  United  States  currency,  representing  the  total  amount
forfeitable as a result of such offenses.

        6.    If any of the property described above, as a result of
any act or omission of the defendant:

45

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

46

All pursuant to Title 8, United States Code, Section 1324(b)(1), Title 18, United States Code, Section 982(a)(1), and (a)(6), Rule 32.2(a), Federal Rules of Criminal Procedure, and Title 28, United States Code, Section 2461(c).

A TRUE BILL:


FRANK J. CHUT, JR.
ASSISTANT UNITED STATES ATTORNEY


RIPLEY RAND
UNITED STATES ATTORNEY

47