IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

FILED◆
SEP 3 0 2014
IN THIS OFFICE
Clerk U. S. District Court
Greensboro, N.C.
By ___

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | SUPERSEDING |
| | : | |
| v. | : | |
| | : | |
| CRAIG STANFORD EURY, JR. | : | 1:14CR39-1 |
| HARRY LEE WICKER, JR. | : | 1:14CR39-4 |
| KENNETH W. WHITE | : | 1:14CR39-5 |

The Grand Jury charges:

COUNT ONE

CONSPIRACY TO DEFRAUD THE UNITED STATES

BACKGROUND INFORMATION

1. At all times material to this Indictment, INTERNATIONAL LABOR MANAGEMENT CORPORATION ("ILMC") was a corporation organized under the laws of the State of North Carolina with its headquarters and place of business in Vass, Moore County, North Carolina, in the Middle District of North Carolina. At all times material herein, ILMC was in the business of preparing and submitting petitions on behalf of client companies to the United States government for temporary alien workers under the H-2B Visa program and the H-2A agricultural Visa program.

2. At all times material to this Indictment, CRAIG STANFORD EURY, JR., was a resident of Moore County, North Carolina, in the Middle District of North Carolina.

3. At all times material to this Indictment, CRAIG STANFORD EURY, JR., held the primary ownership interest in ILMC. Prior to April 2008, CRAIG STANFORD EURY, JR., was the President of ILMC. CRAIG STANFORD EURY, JR., founded ILMC in 1994.

4. At all times material to this Indictment, CRAIG STANFORD EURY, JR., exercised control over the management and finances of ILMC. During the times material to this Indictment, CRAIG STANFORD EURY, JR., directed funds in excess of one million dollars to be withdrawn from the bank account of ILMC for his personal use and benefit.

5. At all times material to this Indictment, an individual whose initials are S.E.F. was a resident of Moore County, North Carolina, in the Middle District of North Carolina.

6. From April 2008 to the present, S.E.F. was and has remained the President of ILMC. In this role, S.E.F. maintained and maintains her office and place of business at the offices of ILMC in Vass, Moore County, North Carolina, in the Middle District of North Carolina. Prior to April 2008, S.E.F. was the Vice President of Operations of ILMC, and worked under the direction of CRAIG STANFORD EURY, JR.

7. From April 2008 to the present, S.E.F., as President of ILMC, was and is responsible for the daily operations of

2

ILMC, which included and includes contact with ILMC client companies, supervision and training of ILMC employees in the preparation of H-2A Visa Petitions and preparation of H-2B Visa Petitions.

8. At all times material herein, North Carolina Growers Association ("NCGA") was a North Carolina non-profit corporation organized under the laws of the state of North Carolina with its office and place of business in Vass, Moore County, North Carolina. NCGA is in the business of obtaining H-2A agricultural workers for its member farmers.

9. Pursuant to the North Carolina Non-Profit Corporation Act at North Carolina General Statutes Section 55A-8-30, officers of a North Carolina non-profit corporation owe a duty of good faith to the non-profit corporation and its members.

10. At all times material to this Indictment, HARRY LEE WICKER, JR., was a resident of Moore County, North Carolina, in the Middle District of North Carolina, and served as a Deputy Director of NCGA with a duty of good faith to NCGA and its members. HARRY LEE WICKER, JR., also served as a consultant for ILMC.

11. At all times material to this Indictment, KENNETH W. WHITE was a resident of Moore County, North Carolina, in the Middle District of North Carolina, and served as a Deputy

3

Director of NCGA with a duty of good faith to NCGA and its members.

12. At all times material to this Indictment, CRAIG STANFORD EURY, JR., served as Executive Director of NCGA with a duty of good faith to NCGA and its members.

13. At all times material to this Indictment, Consular Solutions, Inc. ("CSI") was a corporation formed under the laws of the Nation of Mexico with its primary office and place of business in Monterrey, Mexico. CSI was in the business of recruiting Mexican workers to work in the United States.

14. At all times material to this Indictment, CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE exercised control over the finances and operations of CSI.

15. At all times material to this Indictment, CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE concealed their control of CSI from NCGA and its members in violation of their duty of good faith to NCGA and its members.

16. At all times material to this Indictment, APPLICATION SERVICES AND ADMINISTRATIVE PROGRAM, LLC ("ASAP") was a limited liability company created under the laws of the state of Delaware with its office and place of business in Amherst, Virginia.

17. In January 2009, CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE directed the incorporation of

4

ASAP. From January 2009 to present, CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE have served and are serving as members of ASAP and exercised control over the finances and operations of ASAP.

18. At all times material to this Indictment, The Labor Company ("TLC") was a corporation organized under the laws of the state of Virginia with its office and place of business in Amherst, Virginia. TLC was in the business of preparing and submitting petitions on behalf of client companies to the United States government for temporary alien workers under the H-2B Visa program and the H-2A agricultural visa program.

19. At all times material to this Indictment, CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE exercised control over the finances and operations of TLC.

20. At all times material to this Indictment, the United States Department of Labor was an agency within the executive branch of the United States with the duty of enforcing the labor laws of the United States, including wage and hour laws and laws regarding the employment of temporary alien workers within the United States.

21. At all times material to this Indictment, United States Citizenship and Immigration Services ("USCIS"), as part of the Department of Homeland Security, was an agency within the executive branch of the government of the United States with the

5

duty of enforcing and administering the immigration and citizenship programs of the United States, including the approval of H-2B Visas.

22. At all times material to this Indictment, the United States Department of State was an agency within the executive branch of the government of the United States with the duty of regulating the issuance of passports and visas for entry into the United States, including the issuance of H-2B Visas for the entry of alien temporary workers into the United States.

## THE H-2A AND H-2B VISA PROCESS

23. The H-2B non-agricultural worker program is administered by the United States Department of Labor and USCIS. The H-2B program allows United States employers to fill specific temporary non-agricultural jobs. For an employer to qualify for H-2B non-immigrant classification, thereby allowing foreign nationals to work for that employer, the employer is required to establish that:

a. the need for the alien workers' services or labor is temporary, regardless of whether the underlying jobs can be described as permanent or temporary. The employer's need is considered temporary if it is a one-time need, a seasonal need, a peak load need, or an intermittent need;

6

b.   there is not a sufficient number of United States citizen workers who are able, willing, or qualified and available to do the temporary work; and

c.   the employment of H-2B alien workers will not adversely affect the wages and working conditions of similarly employed United States citizen workers.

24.   The H-2B Visa program carries a statutory numerical limit, or "cap," which provides that no more than 66,000 aliens may be issued H-2B Visa classifications during any fiscal year.

25.   Before requesting H-2B classification from USCIS, an employer seeking H-2B workers must first submit an Application for Foreign Temporary Labor Certification, known as a Form ETA-750 (prior to January 2009), or as a Form ETA-9142 (after January 2009), to the Department of Labor.   The completed ETA-750 or ETA-9142 must describe the number of jobs to be filled and the specific nature, dates and locations of the jobs that the H-2B workers will perform in the United States.   The employer must demonstrate in the ETA-750 or ETA-9142 that it has conducted recruitment efforts in the geographical area of proposed employment and has not found United States citizen workers willing to perform the work set forth and described in the ETA-750 or ETA-9142 at the prevailing wage for that area. After review of the ETA-750 or ETA-9142, the Department of Labor issues a Final Determination Letter indicating whether an

7

employer's application has been approved or denied. If approved, this certification may not be transferred to another employer.

26. Both the ETA-750 and the ETA-9142 require that the employer certify under penalty of perjury that the information provided is true and accurate. The Department of Labor relies on the factual accuracy of the ETA-750 and ETA-9142 in making the determination whether the application is approved or denied. In this regard, the Department of Labor relies on the signature of the employer certifying that the ETA-750 or ETA-9142 is true and accurate. The Department of Labor will not review or approve an ETA-750 or ETA-9142 that is not certified by the employer under penalty of perjury.

27. After the Department of Labor has issued a Final Determination Letter certifying an employer for use of H-2B workers for specified jobs and job locations, the employer must submit a Form I-129, "Petition for Nonimmigrant Worker," with USCIS to obtain approval for issuance of H-2B Visas. As with the ETA-750 and ETA-9142, the Form I-129 requires the employer to describe the number of jobs to be filled, the number of H-2B Visas requested for alien temporary workers, and the specific nature and locations of the jobs that the H-2B workers will perform in the United States. The employer must attach the certified ETA-750 or ETA-9142 to the I-129 petition.

8

28. The Form I-129 requires that the employer certify under penalty of perjury that the information provided is true and accurate. USCIS relies on the factual accuracy of the Form I-129 in making the determination of whether the application is approved or denied. In this regard, USCIS relies on the signature of the employer certifying that the Form I-129 is true and accurate. USCIS will not review or approve a Form I-129 that is not certified by the employer under penalty of perjury.

29. Upon USCIS approval of a Form I-129, USCIS issues an approval notice informing the employer that its petition has been approved and the H-2B Visas may be applied for at the United States Consulate.

30. The actual H-2B Visa is issued to an alien worker after approval by the United States consulate just prior to entering the United States. The H-2B Visa bears the following information:

    a. The name and picture of the alien worker;

    b. The I-129 petition number under which USCIS approved issuance of the H-2B Visa; and

    c. The name of the. employer for which USCIS approved issuance of the H-2B Visa and for whom the client worker is authorized to enter the United States and work for at the location and the dates set forth in the Form I-129 and approved by USCIS.

9

31.  H-2B workers who are already in the United States may change employers only if the new employer files a new Form I-129 for each worker with USCIS.  The H-2B workers may not begin work with new employers until new Forms I-129 are approved by USCIS authorizing the client workers to change employers.

32.  An employer who employs H-2B workers must notify USCIS if the employment for any H-2B worker ends more than thirty days before the end of the approved employment term.

33.  The H-2A agricultural worker program is administered by the United States Department of Labor and USCIS.  The H-2A program is similar to the H-2B program for non-agricultural temporary workers in that it allows employers to obtain alien workers for specific temporary agricultural jobs.  The application process for the H-2A program is generally similar to that of the H-2B program except that there is no cap on H-2A Visas.

34.  The H-2A program also requires that the H-2A employer submit a Form I-129 to USCIS.  The Form I-129 in an H-2A case also requires that the employer certify under penalty of perjury that the information provided is true and accurate.  USCIS relies on the factual accuracy of a Form I-129 in making the determination of whether an H-2A application is approved or denied in the same manner as an H-2B application.

35. Prior to January 2009, recruiters and agents were not prohibited from charging foreign workers seeking H-2A or H-2B employment a fee as a condition of an offer of H-2A and H-2B employment in the United States.

36. Prior to January 2009, CSI, at the direction of and for the benefit of CRAIG STANFORD EURY, JR., HARVEY LEE WICKER, JR., and KENNETH W. WHITE, did require foreign workers to pay a fee as a condition of their offer of H-2A and H-2B employment in the United States. A large portion of this fee was then transferred by CSI to accounts in the United States controlled by CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE for their personal use and benefit.

37. From in or about 2006 to in or about January 2009, CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE directed NCGA to pay an $80.00 per worker fee to CSI for recruiting fees without revealing to NCGA and its members that CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE would personally benefit from payment of these fees in violation of their duty of good faith to NCGA and its members. CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE converted approximately fifty percent of these fees to their own use and benefit.

11

38. Effective in January 2009, the United States Department of Homeland Security promulgated regulations 8 C.F.R. 214.2(h)(6)(i)(B) and 20 C.F.R. 655.135(j) and (k), which prohibited a facilitator, recruiter, or similar employment service from charging a fee from workers as a condition of the offer of obtaining H-2B or H-2A employment.

## OBJECTS OF THE CONSPIRACY

39. From in or about December 2006, continuing up to and including on or about April 1, 2013, the exact dates to the Grand Jurors unknown, in the County of Moore, in the Middle District of North Carolina, and elsewhere, CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., KENNETH W. WHITE and S.E.F., and divers other persons, both known and unknown to the Grand Jurors, knowingly and unlawfully combined, conspired and agreed together and with other persons:

OBJECT ONE:

a.   CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., KENNETH W. WHITE and S.E.F.: to defraud the United States of America concerning one or more of its lawful government functions and rights, that is:

i.   To defraud the United States by impeding, impairing and obstructing the lawful governmental function of the Department of Labor to administer, regulate and enforce the

12

regulations and laws relating to the implementation of the H-2A and H-2B non-immigrant Visa programs;

ii. To defraud the United States by impeding, impairing and obstructing the lawful governmental functions of USCIS to administer, regulate and enforce violations, regulations and laws relating to the hiring, employment and presence of aliens in the United States;

iii. To defraud the United States by impeding, impairing and obstructing the lawful governmental function of the Department of Labor to ensure that American workers are not harmed by the entry of alien workers into the job market in the United States, both in protecting the availability of jobs for United States citizen workers and in ensuring the provision of fair wages for United States citizen workers; and

iv. To defraud the United States by impeding, impairing and obstructing the lawful governmental function of the State Department to monitor and regulate the issuance of H-2B Visas at United States consulates.

OBJECT TWO:

b. CRAIG STANFORD EURY, JR., and S.E.F.: for the purpose of commercial advantage and private financial gain, to encourage and induce aliens to come, enter and reside in the United States, in knowing and in reckless disregard of the fact that such coming to, entry and residence in the United States

13

was in violation of federal law, to wit: Title 8, United States Code, Section 1324(a)(1)(A)(iv);

OBJECT THREE:

c.  CRAIG STANFORD EURY, JR., and S.E.F.: to use false and fraudulent means and to otherwise obtain, use and attempt to use H-2B Visas for entry into the United States by fraud, in violation of Title 18, United States Code, Section 1546(a).

OBJECT FOUR:

d.  CRAIG STANFORD EURY, JR. and S.E.F.: to knowingly engage and attempt to engage in monetary transactions by and through a financial institution affecting interstate and foreign commerce in criminally derived property of a value greater than $10,000.00, being the proceeds of a specified illegal activity, that is, visa fraud, in violation of Title 18, United States Code, Section 1546(a), and inducing aliens to enter and reside in the United States in knowing and reckless disregard that such entry and residence was in violation of federal law, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iv); all in violation of Title 18, United States Code, Sections 1956(h) and 1957.

## MANNERS AND MEANS OF THE CONSPIRACY

40.  At all times during the conspiracy, CRAIG STANFORD EURY, JR., and S.E.F. did direct and control the operations of

14

ILMC. This direction included instructing ILMC employees on the H-2A and H-2B Visa application process and the preparation of Department of Labor and USCIS forms and petitions.

41. It was a further part of the conspiracy that CRAIG STANFORD EURY, JR., directly profited from the operations of ILMC. From in or about November 2009, the exact dates to the Grand Jurors unknown, up to and including on or about October 15, 2012, CRAIG STANFORD EURY, JR., directed that ILMC disburse approximately $1,120,000.00 to him for his personal use and benefit.

42. It was a further part of the conspiracy that CRAIG STANFORD EURY, JR., and S.E.F., through ILMC, falsely petitioned for and obtained extra H-2B Visas above and beyond the actual needs of their client employers for the purpose of creating pools of extra Visas. CRAIG STANFORD EURY, JR., and S.E.F. falsely obtained and used such falsely obtained extra H-2B Visas for the financial benefit of ILMC, CRAIG STANFORD EURY, JR., and S.E.F. by fraudulently allowing employers who could not otherwise obtain H-2B Visas due to the operation of the cap to use H-2B Visas to bring alien workers into the United States under the pretense they were going to work for the employers for whom the H-2B Visas had been approved. Since ILMC falsely obtained H-2B Visas prior to the cap being reached, other

15

employer and competing agents were not able to obtain H-2B
Visas.

43. It was a further part of the conspiracy that CRAIG
STANFORD EURY, JR., and S.E.F., through ILMC, falsely and
fraudulently represented to the Department of Labor and USCIS
that their client employers had jobs for H-2B workers in greater
numbers than actually needed by the client employers.

44. It was a further part of the conspiracy that CRAIG
STANFORD EURY, JR., and S.E.F., through ILMC, falsely and
fraudulently instructed clients that they needed to petition for
H-2B Visas above and beyond their actual needs to ensure that
they would be approved for the excess H-2B Visas, which CRAIG
STANFORD EURY, JR., and S.E.F., through ILMC, would then
fraudulently use to enter alien workers into the United States
for other client employers or otherwise use to benefit
themselves.

45. It was a further part of the conspiracy that CRAIG
STANFORD EURY, JR., and S.E.F. caused ILMC to charge client
employers based on ranges of numbers of H-2B Visas sought rather
than actual numbers sought (for example, billing one charge for
petitions for between one and ten Visas rather than billing for
seven individual Visas), thereby encouraging client employers to
seek more H-2B Visas than necessary and to petition for numbers
of H-2B Visas in excess of their actual needs.

16

46.  It was a further part of the conspiracy that S.E.F., through ILMC, instructed client employers to represent to the Department of Labor and USCIS that jobs for H-2B workers began at times different from those times that the workers would actually be needed, thereby allowing ILMC to seek H-2B Visas prior to the cap being reached and denying H-2B Visas to employers setting forth accurate start dates in their H-2B Visa petitions.

47.  It was a further part of the conspiracy that S.E.F. agreed with an ILMC client whose initials are S.P. that the client would create "winter companies" that could obtain H-2B Visas under the pretense that workers were needed for winter seasonal jobs, such as snowmakers.  These "winter companies," however, were actually created for the purpose of obtaining H-2B Visas prior to the cap being reached, and thereby facilitated the admission of alien workers into the United States in order to work in other spring and summer jobs.

48.  It was a further part of the conspiracy that S.E.F. falsely instructed at least one client employer that it could obtain alien workers by falsely claiming that such workers were needed for agricultural work, thereby obtaining H-2A Visas to avoid the H-2B cap.  S.E.F.  further instructed this client employer that the client employer could then employ those H-2A workers in H-2B positions.

17

49. It was a further part of the conspiracy that S.E.F. directed ILMC employees to prepare false petitions for H-2A workers, knowing that the need of the client employers for H-2A Visas was merely a ruse and pretense to obtain entry for alien workers into the United States in order to take H-2B employment positions.

50. It was a further part of the conspiracy that S.E.F., through ILMC, prepared and caused to be prepared false and fraudulent Forms I-129 purporting to "change" employers for alien workers admitted into the United States under H-2A Visas, although those alien workers had in fact never worked in H-2A positions, as S.E.F. then well knew, and had been admitted to the United States for H-2B employers under the false pretense that the alien workers were needed for H-2A jobs.

51. It was a further part of the conspiracy that CRAIG STANFORD EURY, JR., and S.E.F., through ILMC, did prepare and file Forms I-129 with false and misleading job descriptions for the purpose of inducing USCIS to approve H-2B Visa petitions.

52. It was a further part of the conspiracy that CRAIG STANFORD EURY, JR., and S.E.F., through ILMC, used extra Visas obtained over and above the needs of employers by providing Visas to other client employers who were not able to obtain H-2B Visas due to the operation of the cap.

18

53. It was a further part of the conspiracy that CRAIG STANFORD EURY, JR., and S.E.F., through ILMC, did instruct alien workers to cross into the United States under the pretense that said workers would be working for client employers under whose names the "extra" H-2B Visas had been obtained, when, in fact, as CRAIG STANFORD EURY, JR., and S.E.F. then well knew, the alien workers would be working with different client employers, all in reckless disregard that those alien workers would be working in violation of their H-2B Visas and in violation of law.

54. It was a further part of the conspiracy that CRAIG STANFORD EURY, JR., and S.E.F., through ILMC and its employees, did falsely and fraudulently inform client employers that it was legal for alien workers to be admitted into the United States as working for the client employers under whose names the extra H-2B Visas had been obtained if the alien workers worked for a token period of two weeks for said client employers.

55. It was a further part of the conspiracy that CRAIG STANFORD EURY, JR., and S.E.F. maintained the practice described in Paragraphs 53 through 54 for the purpose of creating records that alien workers had worked at the original petitioning client employers, thereby misleading the Department of Labor and USCIS that the alien workers had been admitted into the United States to work at their documented employment locations, when CRAIG

19

STANFORD EURY, JR., and S.E.F. intended at all times to have those alien workers admitted to the United States for other employers who were legally barred from obtaining H-2B Visas by operation of the cap.

56. It was a further part of the conspiracy that S.E.F. and ILMC employees acting at her direction, for the purpose of misleading the Department of Labor and USCIS, did instruct and encourage client employers to create false and fraudulent payroll records reflecting that alien workers had actually worked with employers under whose names H-2B Visas had been obtained and pursuant to which those alien workers were admitted into the United States.

57. It was a further part of the conspiracy that S.E.F. and ILMC employees acting at her direction did instruct and encourage client employers receiving alien workers who were admitted into the United States under H-2B Visas of other employers to reimburse the employers under whose names the workers had been admitted to the United States for the costs of employing alien workers for two weeks.

58. It was a further part of the conspiracy that CRAIG STANFORD EURY, JR., and S.E.F., through ILMC and its employees, did file false and fraudulent Forms I-129 seeking changes of employers for H-2B workers fraudulently admitted to the United States under the H-2B Visas of other employers, thereby falsely

20

representing that the workers were changing employers, when, in fact, as CRAIG STANFORD EURY, JR., and S.E.F. then well knew, the alien workers had not worked for the original employers or had only worked for those employers for token periods to mislead USCIS and the Department of Labor. CRAIG STANFORD EURY, JR., S.E.F. and ILMC employees acting at their direction filed these false and fraudulent petitions as a pretense to mislead the Department of Labor and USCIS and to conceal the fact that the workers had been admitted into the United States under the original employers' H-2B Visas in violation of law. CRAIG STANFORD EURY, JR., S.E.F. and ILMC employees acting at their direction then charged the new employers for filing the "change" petitions, thereby allowing ILMC to profit twice by filing additional petitions for the same alien workers.

59. It was a further part of the conspiracy that CRAIG STANFORD EURY, JR., and S.E.F., through ILMC, required that client employers provide CRAIG STANFORD EURY, JR., or S.E.F. with permission to sign their officers' names to various documents required to be filed in the H-2A and H-2B application process, including Department of Labor documents and Forms I-129. CRAIG STANFORD EURY, JR., and S.E.F. did not inform client employers that CRAIG STANFORD EURY, JR., S.E.F. or an ILMC employee acting at their direction would place false signatures of the officers of client employers onto certifications made

21

under the penalty of perjury, thereby falsely representing to the Department of Labor and USCIS that the officers had reviewed the documents and certified that they were accurate under penalty of perjury.

60. It was a further part of the conspiracy that CRAIG STANFORD EURY, JR., S.E.F. and ILMC employees acting at their direction placed the false signatures of the names of officers of client employers onto certifications made under the penalty of perjury on Forms I-129, thereby falsely representing to the Department of Labor and USCIS that the petitions had been certified to be factually accurate by the petitioning employers, when, in fact, as CRAIG STANFORD EURY, JR., and S.E.F. then well knew, those client employers had not reviewed the petitions and the petitions often contained false and fraudulent representations, including inflated numbers of workers needed, false job start dates, incorrect job descriptions and inaccurate rates of pay and benefits.

61. It was a further part of the conspiracy that CRAIG STANFORD EURY, JR., S.E.F. and ILMC employees acting at their direction placed false signatures of the officers of client employers onto certifications on Forms I-129 made under the penalty of perjury when the officers had not given permission to sign the officers' names.

22

62. It was a further part of the conspiracy that CRAIG STANFORD EURY, JR., S.E.F. and ILMC employees acting at their direction failed to provide client employers with copies of Forms I-129 filed and prepared on their behalf by ILMC, even when client employers requested copies of the Forms I-129 for their records.

63. It was a further part of the conspiracy that CRAIG STANFORD EURY, JR., S.E.F. and ILMC employees acting at their direction instructed client employers how to conduct interviews for United States citizen workers in such a manner as to suppress the hiring of United States citizen workers, thereby allowing ILMC to profit from filling the jobs with H-2B workers while depriving United States citizen workers of the opportunity to secure those jobs.

64. It was a further part of the conspiracy that S.E.F. and ILMC instructed client companies to hire token United States citizen workers to appear to be engaged in the good faith hiring of United States citizen workers.

65. It was a further part of the conspiracy that, to avoid losing their lucrative per-worker fee due to the promulgation of new regulations barring the charging of worker fees as a condition of H-2A and H-2B employment, CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE formed ASAP to collect the fee from ILMC and TLC employer clients under the

23

false pretense that ASAP was collecting a $99.00 per-worker fee charged by CSI in Mexico, when in fact the $99.00 fee supposedly charged by ASAP included approximately fifty percent mark-up to allow CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE to recoup the fees previously charged to workers as a condition of their H-2A and H-2B employment, but now barred by the United States Department of Homeland Security.

66. It was a further part of the conspiracy that CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE directed ASAP to bill for and collect from ILMC and TLC client employers a $99.00 fee under the false pretense that such fee was a recruiting fee charged in Mexico by CSI, when as CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE then well knew, the fee was inflated to include monies directly for the benefit of CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE, which fees were previously collected from workers as a condition of H-2B employment prior to such practice being prohibited by the United States Department of Homeland Security.

67. It was a further part of the conspiracy that CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE directed ASAP to threaten ILMC and TLC clients with cancellation of workers if the $99.00 ASAP fee was not paid to ASAP even though CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and

24

KENNETH W. WHITE knew ASAP had no legal authority to determine who the United States, through its agencies, issued visas for entry into the United States.

68. It was a further part of the conspiracy that CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE knowingly concealed their interest in and control of TLC, ASAP and CSI from clients by instructing S.E.F., ILMC and TLC to represent that each was a separate and autonomous, third-party entity, when in fact, as CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE then well knew, ILMC, TLC, ASAP and CSI were controlled and directed by CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE.

69. It was a further part of the conspiracy that in February 2009, CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE directed that NCGA pay ASAP an $80.00 per worker fee purportedly charged by CSI, despite the fact that NCGA was not in violation of the new regulations and was already making payments directly to CSI. CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE concealed from NCGA and its members that they would use ASAP to convert approximately fifty percent of fees paid to ASAP by NCGA to their own benefit in violation of their duty of good faith to NCGA and its members.

25

## OVERT ACTS

70.  To accomplish the objects of the conspiracy, CRAIG STANFORD EURY, JR., S.E.F. and divers other persons performed and caused to be performed the following overt acts in Moore County, in the Middle District of North Carolina, and elsewhere.

71.  On or about June 28, 2006, CRAIG STANFORD EURY, JR., filed, or caused the filing of by employees of ILMC acting at his direction, a Form I-129, petition number EAC-07-062-52723, for 110 H-2B Visas on behalf of Best Landscape, LLC, Myrtle Beach, South Carolina, such petition bearing the false signature and certification of an officer of Best Landscape, LLC, whose initials are W.T.

72.  On or about January 15, 2007, CRAIG STANFORD EURY, JR., filed, or caused the filing of by employees of ILMC acting at his direction, a Form I-129, petition number EAC-07-102-52319, for eighty H-2B Visas on behalf of Landscape Maintenance, LLC, Savannah, Georgia, such petition bearing the false signature and certification of an officer of Landscape Maintenance, LLC, whose initials are W.T.

73.  On or about January 29, 2007, CRAIG STANFORD EURY, JR., filed, or caused the filing by employees of ILMC, a Form I-129, petition number EAC-07-081-52003, for ten H-2B Visas on behalf of Sunland Fire Protection, Inc., High Point, North Carolina, where such petition bearing the false signature and

26

certification of an officer of Sunland Fire Protection, Inc., whose initials are R.S., and such petition falsely representing that jobs existed for landscape workers, when in fact Sunland Fire Protection, Inc., employed no landscape workers and was seeking employees to work as pipe-fitters at a higher rate of pay than that represented on the Form I-129.

74. On or about January 29, 2007, CRAIG STANFORD EURY, JR., filed, or caused the filing by employees of ILMC acting at his direction, a separate Form I-129, petition number EAC-07-082-50914, for ten H-2B Visas on behalf of Sunland Fire Protection, Inc., High Point, North Carolina, such petition bearing the false signature and certification of an officer of Sunland Fire Protection, Inc., whose initials are R.S., and such petition falsely representing that jobs existed for landscape workers, when in fact Sunland Fire Protection, Inc., employed no landscape workers and was seeking employees to work as pipe-fitters at a higher rate of pay than represented on the Form I-129.

75. On or about April 1, 2008, S.E.F. instructed an ILMC client whose initials are M.M. that he could avoid the operation of the H-2B Visa cap and obtain workers for Miller's Restaurant in Kill Devil Hills, North Carolina, by petitioning for H-2A agricultural Visas for restaurant workers under the pretense that they were needed for agricultural work at a hunting farm in

27

Fairfield, North Carolina, owned by Loumac, LLC. S.E.F. advised M.M. that the alien workers could then be transferred to H-2B Visas once they had entered the United States under the pretense that they were needed for farm work.

76. On or about April 2, 2008, S.E.F. filed, or caused the filing of by employees of ILMC acting at her direction, a Form ETA-750 on behalf of Loumac, LLC, falsely stating that ten jobs existed for alien workers at the Loumac, LLC, farm in Fairfield, North Carolina, when in fact the intent was to fraudulently obtain H-2A Visas to allow workers to enter the United States, not for agricultural work, but for work in a restaurant.

77. On or about April 22, 2008, S.E.F. filed, or caused the filing of by employees of ILMC acting at her direction, a Form I-129, petition number WAC-08-144-54538, for ten H-2A Visas on behalf of Loumac, LLC, under the false pretense that such H-2A Visas were needed for alien workers at the Loumac, LLC, farm in Fairfield, North Carolina, when, in fact, the alien workers were never intended to work at the farm.

78. On or about May 18, 2008, S.E.F., or an ILMC employee acting at her direction, instructed M.M. that the alien workers who entered the United States under the H-2A Visas falsely obtained through petition number WAC-08-144-54538 did not have to report to the Loumac, LLC, farm in Fairfield, North Carolina, but could instead immediately begin work at Miller's Restaurant

28

in Kill Devil Hills, North Carolina, in disregard of their status as H-2A agricultural workers.

79. On or about June 3, 2008, S.E.F. filed, or caused the filing of by employees of ILMC acting at her direction, a Form I-129, petition number EAC-08-171-52508, on behalf of Miller's Restaurant, Kill Devil Hills, North Carolina, falsely stating that the alien workers who entered the United States under H-2A Visas obtained under I-129 petition WAC-08-144-54538 were "changing" employers to Miller's Restaurant, when, in fact, those alien workers had never worked as farm workers and had been working out of visa status at Miller's Restaurant since entering the United States under the pretense that they were H-2A agricultural workers.

80. On or about April 28, 2008, S.E.F. directed that five alien workers enter the United States using "extra" Visas obtained for Carefree Service Company, Boone, North Carolina, under the pretense that they were intended to work for Carefree Service Company in Boone, North Carolina, when, in fact, they were intended to work for Southeast Woodland Service, Inc., in Conway, South Carolina, which company was at that time barred by operation of the cap from obtaining H-2B Visas. S.E.F. further directed that the alien workers proceed to work for Southeast Woodland Services, Inc., after working for a token two-week period at Carefree Services Company to create the impression

29

that the workers had actually entered the United States to work at Carefree Service Company.

81.    On or about July 10, 2008, S.E.F. filed, or caused the filing of by employees of ILMC acting at her direction, a Form I-129, petition number EAC-08-173-51883, on behalf of Southeast Woodland Service, Inc., Conway, South Carolina, falsely stating that five alien workers who entered the United States under "extra" H-2B Visas obtained for Carefree Service Company were "changing" employers to Southeast Woodland Services, Inc., when, in fact, they had entered the United States for the purpose of working for Southeast Woodland Services, Inc.

82.    On or about July 18, 2008, S.E.F. filed, or caused the filing by employees of ILMC acting at her direction, a form I-129, petition number EAC-08-206-51398, for eighteen H-2B Visas on behalf of Sunland Fire Protection, Inc., High Point, North Carolina, such petition bearing the false signature and certification of an officer whose initials are R.S. and falsely representing that jobs existed for landscape workers, when in fact Sunland Fire Protection, Inc., employed no landscape workers and was seeking employees to work as pipe-fitters at a higher rate of pay than represented on the I-129 petition.

83.    In or about June or July 2008, S.E.F. met with an ILMC client whose initials are S.P. to discuss the creation of "winter companies" to allow S.P. and ILMC to bring alien workers

into the United States prior to the operation of the cap. To achieve this goal, S.P. created a "winter" company, Winterscapes, LLC, in Boone, North Carolina.

84. In or about June or July 2008, S.P. contacted S.E.F. to determine how many H-2B Visas he could request for Winterscapes, LLC, for the purpose of entering alien workers into the United States prior to the operation of the cap. S.E.F. instructed S.P. that he could request as many workers as he wanted, as Winterscapes, LLC, was a start-up company. S.E.F. did not inform S.P. that he could only legally petition for alien workers that were actually needed for specific positions at Winterscapes, LLC, and which could not be filled with United States citizen workers. Based on S.E.F.'s instructions, S.P. requested that ILMC petition for 150 snowmakers despite the fact that S.P. knew that jobs in North Carolina only existed for approximately twenty-five snowmakers.

85. On or about July 8, 2008, S.E.F. filed, or caused the filing of by employees of ILMC acting at her direction, a Form I-129, petition number EAC-08-196-51524, which petition falsely stated that Winterscapes, LLC, Boone, North Carolina, had jobs for 150 alien workers as snowmakers, such petition bearing the false signature and certification of an officer of Winterscapes, LLC, whose initials are S.P. S.E.F. knew at the time of the filing of the above petition that the large majority of the

31

"snowmakers" would be used to work at other jobs once they entered the United States under H-2B Visas obtained for Winterscapes, LLC.

86. On or about December 16, 2008, S.E.F. filed, or caused the filing of by employees of ILMC acting at her direction, a Form I-129, petition number EAC-09-057-51033, for ten H-2B Visas on behalf of Arbor Lawns, Inc., Orchard Park, New York, such petition bearing the false signature and certification of an officer of Arbor Lawns, Inc., whose initials are G.B., and falsely claiming that Arbor Lawns, Inc., needed ten alien workers, when, in fact, the company had need for only three alien workers.

87. On or about March 24, 2009, S.E.F., or an ILMC employee acting at her direction, directed that three alien workers enter the United States using "extra" Visas obtained for Arbor Lawns, Inc., Orchard Park, New York, without the knowledge of such company, under the pretense that they were intended to work for Arbor Lawns, Inc., in Orchard Park, New York, as landscape workers, when, in fact, they were intended to work for R.H. Loven Company as concrete plant workers in Pineola, North Carolina, which company was then barred by operation of the cap from obtaining H-2B Visas. S.E.F., or an ILMC employee acting at her direction, further directed that the alien workers

32

proceed directly to Pineola, North Carolina, without working for Arbor Lawns, Inc., in Orchard Park, New York.

88. On or about March 24, 2009, S.E.F., or an ILMC employee acting at her direction, directed that an alien enter the United States using an "extra" Visa obtained for Arbor Lawns, Inc., Orchard Park, New York, without the knowledge of such company, under the pretense that the alien worker was intended to work for Arbor Lawns, Inc., in Orchard Park, New York, as a landscape worker, when, in fact, the alien worker was intended to work as a hotel worker for Harborside Motel in Ocracoke, North Carolina, which company was then barred by operation of the cap from obtaining H-2B Visas. S.E.F., or an ILMC employee acting at her direction, further directed that the worker proceed directly to Ocracoke, North Carolina, without working for Arbor Lawns, Inc., in Orchard Park, New York.

89. On or about March 1, 2009, S.E.F. instructed an officer of Silverwater Traders, LLC, in Ocracoke, North Carolina, whose initials are K.S., that Silverwater Traders, LLC, could use an H-2B Visa obtained in its name to bring an alien worker to the United States under the pretense that the alien worker would work at Silverwater Traders, LLC, when the worker was actually intended to work at Harborside Motel in Ocracoke, North Carolina.

33

90. On or about March 1, 2009, S.E.F. instructed K.S. that Harborside Motel could reimburse Silverwater Traders, LLC, for the expenses of bringing the alien worker into the United States for the benefit of Harborside Motel.

91. On or about March 24, 2009, S.E.F., or an ILMC employee acting at her direction, directed that an alien enter the United States using an "extra" Visa obtained for Silverwater Traders, LLC, in Ocracoke, North Carolina, under the pretense that the alien worker was intended to work for Silverwater Traders, LLC, when, in fact, the alien worker was intended to work as a hotel worker for Harborside Motel in Ocracoke, North Carolina, which company was then barred by operation of the cap from obtaining H-2B Visas. S.E.F. further directed that the alien worker proceed to work for Harborside Motel after working for a token two-week period at Silverwater Traders, LLC, to create the impression that the worker had actually entered the United States to work at Silverwater Traders, LLC.

92. On or about March 26, 2009, S.E.F. filed, or caused the filing of by employees of ILMC acting at her direction, a Form I-129, petition number EAC-09-124-50363, on behalf of Best Landscape, Inc., Myrtle Beach, South Carolina, falsely stating that sixty-six alien workers who entered the United States under H-2B Visas obtained for Winterscapes, LLC, Boone, North Carolina, under the pretense that they would be working as

34

snowmakers at North Carolina ski resorts, were "changing" employers to Best Landscape, Inc., to work as landscape workers, when, in fact, the alien workers had entered the United States for the purpose of working for Best Landscape, Inc., and had either never worked for Winterscapes, LLC, as snowmakers in North Carolina or had worked for Winterscapes, LLC, for only a token period.

93. On or about April 17, 2009, S.E.F. filed, or caused the filing of by employees of ILMC acting at her direction, a Form I-129, petition number EAC-09-141-53289, on behalf of Harborside Motel, Ocracoke, North Carolina, falsely stating that an alien worker who entered the United States under an "extra" H-2B Visa obtained for Silverwater Traders was "changing" employers to Harborside Motel, Ocracoke, North Carolina, when, in fact, the alien worker had entered the United States for the sole purpose of working for Harborside Motel and had worked for Silverwater Traders only for a token period for which Harborside Motel had reimbursed Silverwater Traders.

94. On or about June 8, 2009, S.E.F. communicated by e-mail with an officer of R.H. Loven Company, Pineola, North Carolina, whose initials are J.L., and informed J.L. that "there was a transfer in the works from another one of our H-2B clients, Arbor Lawns, to your company." S.E.F. further informed J.L. in the e-mail that the "transfer" had not gone through and

35

that R.H. Loven Company could only legally employ the three alien workers provided to them by ILMC if a "transfer" was filed with USCIS. S.E.F. further informed J.L. that R.H. Loven Company would need to submit two weeks of payroll evidence showing that the three alien workers had actually worked for Arbor Lawns for no less than two weeks. S.E.F. further advised J.L. that she could put J.L. in touch with Arbor Lawns, Inc.

95. On or about June 8, 2009, S.E.F. and J.L. had a conversation by telephone. S.E.F. suggested to J.L. that R.H. Loven Company and Arbor Lawns, Inc., could reach an arrangement in which R.H. Loven Company would transfer funds to Arbor Lawns, Inc., for payroll for the alien workers so that Arbor Lawns, Inc., could then issue payroll checks to the alien workers, thereby creating the pretense that the alien workers were employed by Arbor Lawns, Inc.

96. On or about July 8, 2008, S.E.F. filed, or caused the filing of by employees of ILMC acting at her direction, a Form I-129, petition number EAC-09-201-51107, which petition falsely stated that Winterscapes, LLC, Boone, North Carolina, had jobs for 246 alien workers as janitors, such petition bearing the false signature and certification of an officer of Winterscapes, LLC, whose initials are S.P. S.E.F. knew at the time of the filing of the above petition that the majority of the "janitors"

36

would be used to work at other jobs once they entered the United States under H-2B Visas obtained for Winterscapes, LLC.

97. Following approval of the Winterscapes, LLC, Form I-129, petition number EAC-09-201-51107, S.P. contacted S.E.F. and informed her that he did not have need for the majority of the 246 H-2B Visas obtained under that petition. S.P. asked S.E.F. if the unneeded H-2B Visas could be returned to USCIS. S.E.F. informed S.P. that there was no procedure for return of H-2B Visas. S.E.F. did not contact USCIS to inform the United States that a Form I-129, petition number EAC-09-201-51107 had contained an inflated request for H-2B Visas.

98. On or about June 8, 2009, S.E.F. contacted an officer of Arbor Lawns, Inc., Orchard Park, New York, whose initials are J.B., by telephone and requested that J.B. allow R.H. Loven Company to use "extra" Arbor Lawn H-2B Visas to bring workers into the United States. After being told by J.B. that Arbor Lawns, Inc., did not consent to the use of any "extra" Arbor Lawn H-2B Visas by R.H. Loven Company, S.E.F. requested that J.B. speak with a representative of R.H. Loven Company directly. The officers of Arbor Lawns, Inc., were unaware of the existence of "extra" Arbor Lawn H-2B Visas prior to S.E.F.'s telephone call to J.B.

99. In or about June or July 2009, the officers of Arbor Lawns, Inc., and R.H. Loven Company agreed not to enter into an

37

arrangement to make it appear that the three alien workers provided to R.H. Loven Company under H-2B Visas issued to Arbor Lawns, Inc., had actually worked at Arbor Lawns, Inc. Thereafter, R.H. Loven Company directed the three alien workers to return to Mexico.

100. On or about August 7, 2009, S.E.F. informed J.L. at R.H. Loven Company by e-mail that USCIS had not issued all of the 66,000 H-2B Visas for fiscal year 2009 and therefore H-2B Visas were available for employers. Also on or about August 7, 2009, J.L. responded by e-mail to S.E.F. and requested that S.E.F. "[p]lease apply for the three that we had to send back to Mexico to return ASAP."

101. On or about August 13, 2009, S.E.F., after being instructed by J.L. to petition for three alien workers on behalf of R.H. Loven Company, Pineola, North Carolina, filed, or caused the filing of by employees of ILMC acting at her direction, a Form I-129, petition number EAC-09-222-50165, which petition falsely stated that R.H. Loven Company had jobs for ten alien workers and falsely requesting that ten H-2B Visas be issued, such petition bearing the false signature and certification of an officer of R.H. Loven Company whose initials are R.L.

102. On or about July 9, 2009, S.E.F. filed, or caused the filing of by employees of ILMC acting at her direction, a Form I-129, petition number EAC-09-199-51795, on behalf of Southeast

38

Woodland Service, Inc., Conway, South Carolina, falsely stating that five alien workers who entered the United States under "extra" H-2B Visas obtained for Woods Plus, Inc., in Lugoff, South Carolina, were "changing" employers to Southeast Woodland Services, Inc., when, in fact, they had entered the United States for the purpose of working for Southeast Woodland Services, Inc., and had worked only for a token period at Woods Plus, Inc.

103. On or about December 16, 2009, S.E.F. filed, or caused the filing of by employees of ILMC acting at her direction, a Form I-129, petition number EAC 09-057-50983, for thirty-eight H-2B Visas on behalf of Enviro-Scapes, LLC, Nashville, Tennessee, such petition bearing the false signature and certification of an officer of Enviro-Scapes, LLC, whose initials are M.R., and falsely claiming need of thirty-eight alien workers, when, in fact, the company had need of fewer than thirty alien workers and could not employ or house alien workers in excess of thirty.

104. On or about January 8, 2010, S.E.F. filed, or caused the filing of by employees of ILMC acting at her direction, a Form I-129, petition number EAC-10-067-51294, for thirty-two H-2B Visas on behalf of Enviro-Scapes, LLC, Nashville, Tennessee, such petition bearing the false signature and certification of an officer of Enviro-Scapes, Inc., whose initials are M.R., and

39

falsely claiming need of thirty-two alien workers, when, in fact, the company had need of fewer than thirty alien workers and could not employ or house alien workers in excess of thirty.

105. On or about January 14, 2011, S.E.F. filed, or caused the filing of by employees of ILMC acting at her direction, a Form I-129, petition number EAC-11-075-50220, for thirty-four H-2B Visas on behalf of Enviro-Scapes, LLC, Nashville, Tennessee, such petition bearing the false signature and certification of an officer of Enviro-Scapes, Inc., whose initials are M.R., and falsely claiming need of thirty-four alien workers, when, in fact, the company had need of fewer than thirty alien workers and could not employ or house alien workers in excess of thirty.

106. On or about March 14, 2012, S.E.F. filed, or caused the filing of by employees of ILMC acting at her direction, a Form I-129, petition number EAC-12-111-51257, for thirty-five H-2B Visas on behalf of Enviro-Scapes, LLC, Nashville, Tennessee, such petition bearing the false signature and certification of an officer of Enviro-Scapes, LLC, whose initials are M.R., and falsely claiming need of thirty-five alien workers, when, in fact, the company had need of fewer than thirty alien workers and could not employ or house alien workers in excess of thirty.

107. On or about February 7, 2013, S.E.F. filed, or caused the filing of by employees of ILMC acting at her direction, a Form I-129, petition number EAC-13-088-51105, for thirty-five H-

2B Visas on behalf of Enviro-Scapes, LLC, Nashville, Tennessee, such petition bearing the false signature and certification of an officer of Enviro-Scapes, LLC, whose initials are M.R., and falsely claiming need of thirty-five alien workers, when, in fact, the company had need of fewer than thirty alien workers and could not employ or house alien workers in excess of thirty.

108. In or about the years 2009 through 2013, CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., KENNETH W. WHITE, S.E.F., ILMC and TLC provided ILMC and TLC clients with written instructions to pay a $99.00 per-worker fee to ASAP, falsely representing that the $99.00 fee was charged by CSI and collected by ASAP, a third-party payment processing company, when in fact, as CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE then well knew, the $99.00 fee was not the fee charged by CSI but was inflated to include fees previously collected by CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE from workers in Mexico as a condition of obtaining H-2B work in the United States but now prohibited by law and regulation, and ASAP was controlled by CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE.

109. In or about the years 2009 through 2013, CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE directed NCGA to make payments to ASAP, when NCGA had no legal

41

or business need to make payments to ASAP and CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE directed that such payments be made to ASAP for the sole purpose of facilitating the conversion of NCGA funds to their own use in violation of their duty of good faith to NCGA and its members.

110. In or about the years 2009 through 2013, CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE directed ASAP to inform ILMC and TLC clients that their workers would be cancelled and not allowed to "cross" into the United States if ASAP was not paid a $99.00 per-worker fee, supposedly charged by CSI, when in fact, as CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE then well knew, such fee was inflated to include fees previously collected by CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE from Mexican workers as a condition of obtaining H-2B work in the United States but now prohibited by the United States Department of Homeland Security, and ASAP and CSI had no authority to prevent workers from entering the United States if so allowed under operation of the laws of the United States.

111. During the course of the conspiracy, CRAIG STANFORD EURY, JR., directed employees of ILMC to disburse funds directly to him for his personal use and benefit, including the funds derived from the conspiracy to defraud the United States, fraudulently obtain H-2B Visas, and encourage the entry into and

42

residence of aliens in the United States in knowing and reckless disregard that such entry and residence was in violation of law. CRAIG STANFORD EURY, JR., directed ILMC employees to disburse ILMC funds to him in the total amount of approximately $1,120,000.00.

All in violation of Title 8, United States Code, Section 1324(a)(1)(A)(v)(I), and Title 18, United States Code, Sections 371 and 2.

## COUNTS TWO THROUGH TEN

1.    Paragraphs 1 through 111 of Count One are hereby re-alleged and incorporated by reference as if fully set forth herein.

2.    On or about November 24, 2009, continuing up to and including on or about October 18, 2012, the exact dates to the Grand Jurors unknown, in the County of Moore, in the Middle District of North Carolina, and elsewhere, CRAIG STANFORD EURY, JR., did knowingly engage and attempt to engage in a monetary transaction by and through a financial institution affecting interstate and foreign commerce in criminally-derived property of a value greater than $10,000.00, that is, the deposit of checks from ILMC at the dates and in the amounts as set forth by individual counts below, into Branch Banking and Trust checking account number            , in the name of Craig Stanford Eury, Jr., such property having been derived from a specified

43

unlawful activity, to wit: visa fraud, in violation of Title 18, United States Code, Section 1546(a), and inducing aliens to enter and reside in the United States in knowing and reckless disregard that such entry and residence was in violation of the law, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iv).

| COUNT | DATE | CHECK | AMOUNT |
|-------|------|-------|--------|
| 2 | 11/24/2009 | # 15674 | $70,000 |
| 3 | 3/18/2010 | # 16073 | $100,000 |
| 4 | 10/6/2010 | # 16379 | $100,000 |
| 5 | 12/30/2010 | # 16510 | $200,000 |
| 6 | 6/22/2011 | # 16979 | $100,000 |
| 7 | 11/2/2011 | # 17133 | $200,000 |
| 8 | 6/21/2012 | # 17760 | $150,000 |
| 9 | 8/21/2012 | # 17856 | $100,000 |
| 10 | 10/18/2012 | # 17903 | $100,000 |

All in violation of Title 18, United States Code, Sections 1957 and 2.

## COUNT ELEVEN

1.    Paragraphs 1 through 111 of Count One are hereby re-alleged and incorporated by reference as if fully set forth herein.

44

2.     From February 1, 2006, continuing up to and including August 1, 2014, the exact dates to the Grand Jurors unknown, in the Middle District of North Carolina, CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE did devise and intend to devise a scheme and artifice to defraud clients of ILMC and TLC, as well as NCGA and its members, of money by materially false representations, pretenses and promises by directing clients of ILMC and TLC, as well as NCGA, to make payments to ASAP under the false pretense that such payments were recruiting and processing fees charged in Mexico by CSI when in fact, as CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE then well knew, the CSI fee was not the fee actually charged in Mexico but contained an approximately fifty percent concealed mark-up to replace fees previously charged to Mexican workers by CSI as a condition of H-2A and H-2B employment, for the benefit of CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE, but now barred by regulations promulgated by the United States Department of Homeland Security.  Such scheme and artifice to defraud made use of the United States mail in its execution.

3.     It was a part of the scheme and artifice to defraud that CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE concealed their control of CSI and the

45

financial benefit they obtained from CSI from NCGA and its members in violation of the duty of good faith of CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE owed to NCGA and its members.

4.    It was a further part of the scheme and artifice to defraud that from in or about 2006, continuing up to and including on or about February 25, 2009, the exact dates to the Grand Jurors unknown, CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE directed that NCGA pay an $80.00 recruiting fee to CSI without revealing that CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE directly financially benefitted from these payments in violation of their duty of good faith to NCGA and its members.

5.    It was a further part of the scheme and artifice to defraud that CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE transferred funds for their personal benefit from bank accounts of CSI in Mexico to accounts controlled by CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE in the United States through shell companies established for the purpose of receiving and concealing the receipt of such funds in the United States.

6.    It was a further part of the scheme and artifice to defraud that CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE, upon promulgation of regulations by the

46

United States Department of Homeland Security prohibiting the collection of fees from foreign workers as a condition of H-2A or H-2B employment, formed ASAP under the pretense that it was a third-party payment processing company collecting fees charged by CSI when, in fact, as CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE then well knew, ASAP was a shell company with one part-time employee that operated only to allow CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE to convert monies obtained from employers under the pretense that they were paying recruiting and processing fees charged by CSI in Mexico that the employer was legally required to pay, all as a replacement for monies previously obtained from workers in Mexico as a condition of H-2A and H-2B employment.

7. It was a further part of the scheme and artifice to defraud that CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE through S.E.F., ILMC and TLC instructed their clients that those clients were required by law to pay a $99.00 per-worker recruiting fee charged by CSI, when in fact such fee was not the fee charged by CSI but included an approximate fifty percent mark-up to allow CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE to fraudulently collect fees from employers that CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE had previously collected

47

from Mexican workers as a condition of H-2A and H-2B employment, since the collection of such fees from workers as a condition of H-2A and H-2B employment was as of 2009 barred by the United States Department of Homeland Security by regulation.

8.   It was a further part of the scheme and artifice to defraud that CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., KENNETH W. WHITE and ASAP provided no services of any type to earn amounts converted for the personal use of CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE by ASAP from fees collected under the pretense that ASAP was recruiting and processing fees charged in Mexico by CSI.

9.   It was a further part of the scheme and artifice to defraud that ASAP collected fees for returning H-2A and H-2B workers who required no recruiting services and who were already in direct contact with their repeat American employers.

10.   It was a further part of the scheme and artifice to defraud that CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE, through S.E.F., ILMC and TLC, directed ILMC and TLC clients to mail payments of the purported $99.00 per-worker CSI recruiting and processing fee to a Post Office box controlled by ASAP.

11.   It was a further part of the scheme and artifice to defraud that CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE, through S.E.F. and ILMC, represented to

48

ILMC clients that mailing such payments to ASAP represented "a simple way for you to submit payment for recruiting services and be in compliance with the new regulations," when, in fact, as CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE then well knew, such fees included amounts well beyond any actual recruiting fees previously charged by CSI, and ILMC clients were not required by the new regulations to make payments for recruiting and processing fees to CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE.

12. It was a further part of the scheme and artifice to defraud that CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE, through S.E.F. and ILMC, represented to ILMC clients that CSI was a separate and autonomous business entity from ILMC when, in fact, as CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE then well knew, ILMC and CSI were not autonomous, but were both controlled by CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE.

13. It was a further part of the scheme and artifice to defraud that CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE, through S.E.F. and ILMC, represented to ILMC clients that ASAP was a "third-party" payment processing company, when, in fact, as CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE then well knew, ASAP was

49

controlled by CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE.

14. It was a further part of the scheme and artifice to defraud that CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE, through S.E.F. and ILMC, represented to ILMC clients that ASAP would assist them in paying fees for "your workers" to prevent the workers from paying out of pocket expenses when, in fact, as CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE then well knew, such fees included amounts well beyond any actual recruiting fees charged by CSI for the purpose of replacing fees charged to Mexican workers as a condition of H-2A and H-2B employment, but as of 2009 were barred by the United States Department of Homeland Security through regulation.

15. It was a further part of the scheme and artifice to defraud that CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE, through S.E.F. and ILMC, informed ILMC clients that the clients' workers would not be allowed to "cross" into the United States if the purported CSI fee was not paid to ASAP, despite the fact that CSI and ASAP had no authority to bar anyone from entering the United States under operation of the law.

16. It was a further part of the scheme and artifice to defraud that CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR.,

50

and KENNETH W. WHITE, through S.E.F., ILMC, and ASAP, represented to ILMC clients that the clients' workers would be "cancelled" if the purported CSI fees were not paid to ASAP.

17. It was a further part of the scheme and artifice to defraud that at least one ILMC client who questioned what services ASAP had provided to him was informed in response by ILMC employees, acting at the direction of CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE, that his workers would be cancelled and not allowed to cross if he did not pay the purported CSI fee to ASAP.

18. It was a further part of the scheme and artifice to defraud that that CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE, through S.E.F. and ILMC, represented to ILMC clients that non-payment of fees to ASAP might result in debarment from the H-2B program or the imposition of civil fines when, in fact, as CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE then well knew, the fees charged by ASAP included amounts well beyond any fee charged by CSI for actual recruiting or processing services in Mexico to allow CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE to replace amounts previously charged to workers in Mexico as a condition of H-2A and H-2B employment, since such fees were as of 2009 barred by the United States Department of Homeland Security by regulation.

51

19. It was a further part of the scheme and artifice to defraud that CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE directed NCGA to make payment to ASAP even though NCGA directly made payments to CSI in Mexico and was in compliance with regulations prohibiting fees to be charged to workers as a condition of H-2A and H-2B employment.

20. It was a further part of the scheme and artifice to defraud that CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE used ASAP to convert a portion of the $80.00 recruiting fee purportedly charged to NCGA by CSI for their own personal uses and benefits in violation of their duty of good faith to NCGA.

21. It was a further part of the scheme and artifice to defraud that CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE concealed from NCGA and its members that a portion of the recruiting fees purportedly charged to NCGA by CSI for recruiting and processing services in Mexico were converted to the personal uses and benefits of CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE, in violation of their duty of good faith to NCGA.

22. It was a further part of the scheme and artifice to defraud that CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE directed ASAP to pay attorney's fees for S.E.F. and ILMC out of the payments to ASAP by ILMC and TLC

52

clients and NCGA under the pretense that ASAP was collecting recruiting and processing fees charged in Mexico by CSI.

23. It was a further part of the scheme and artifice to defraud that CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE concealed from ILMC, ILMC's clients, and NCGA that any portion of fees paid to ASAP under the pretense that ASAP was processing amounts charged for recruitment and processing fees by CSI in Mexico would be converted to the use of CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE.

24. It was a further part of the scheme and artifice that ASAP had no permission from any client of ILMC or TLC, or NCGA, to use fees collected under the pretense that ASAP was processing fees for CSI for any other purpose.

25. It was a further part of the scheme and artifice to defraud that, from on or about February 12, 2009, to on or about December 31, 2013, the exact dates to the Grand Jurors unknown, that ASAP received approximately $5,561,669.00 in payments from ILMC and TLC clients under the pretense that ASAP was collecting a $99.00 per-worker recruiting and processing fee for CSI in Mexico.

26. It was a further part of the scheme and artifice to defraud that, from on or about February 12, 2009, continuing up to and including on or about December 31, 2013, the exact dates

53

to the Grand Jurors unknown, ASAP received approximately $2,801,640.00 in payments from NCGA under the pretense that ASAP was collecting an $80.00 per-worker processing fee for CSI in Mexico.

27. It was a further part of the scheme and artifice to defraud that, from on or about February 12, 2009, continuing up to and including on or about December 31, 2013, the exact dates to the Grand Jurors unknown, CRAIG STANFORD EURY, JR., directed ASAP to make payments to him of $1,092,168.00 from fees collected by ASAP from ILMC clients, TLC clients, and NCGA clients as set forth above.

28. It was a further part of the scheme and artifice to defraud that, from on or about February 12, 2009, continuing up to and including on or about December 31, 2013, the exact dates to the Grand Jurors unknown, HARRY LEE WICKER, JR., directed ASAP to make payments to him through North State Governmental Affairs, a limited liability corporation under his control, of approximately $1,068,080.00 from fees collected by ASAP from ILMC clients, TLC clients, and NCGA clients as set forth above.

29. It was a further part of the scheme and artifice to defraud that, from on or about February 12, 2009, continuing up to and including on or about December 31, 2013, the exact dates to the Grand Jurors unknown, KENNETH W. WHITE directed ASAP to make payments to him of approximately $1,060,080.00 from fees

54

collected by ASAP from ILMC clients, TLC clients, and NCGA clients as set forth above.

## EXECUTION

30. On or about November 23, 2009, in the County of Moore, in the Middle District of North Carolina, CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE, for the purpose of executing the aforesaid scheme and artifice to defraud, and attempting to do so, knowingly placed or caused to be placed in any United States Post Office and authorized depository for mail matter, any matter or thing, that is, an envelope containing a NCGA check to ASAP for purported recruiting fees charged by CSI in the amount of $72,480.00 to be delivered to a Post Office box maintained by ASAP in Piney River, Virginia.

All in violation of Title 18, United States Code, Sections 1341 and 2.

## COUNT TWELVE

1. Paragraphs 1 through 30 of Count Eleven are hereby re-alleged and incorporated by reference as if fully set forth herein.

2. On or about August 10, 2010, in the County of Moore, in the Middle District of North Carolina, CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE, for the purpose of executing the aforesaid scheme and artifice to

55

defraud, and attempting to do so, knowingly placed or caused to be placed in any United States Post Office and authorized depository for mail matter, any matter or thing, that is, an envelope containing an ILMC H-2B application package instructing ILMC client Woods Plus, Inc., in Lugoff, South Carolina, to pay purported recruiting fees to CSI by mailing payment to ASAP at a Post Office box in Piney River, Virginia.

All in violation of Title 18, United States Code, Sections 1341 and 2.

## COUNT THIRTEEN

1.    Paragraphs 1 through 30 of Count Eleven are hereby re-alleged and incorporated by reference as if fully set forth herein.

2.    On or about September 29, 2010, in the County of Moore, in the Middle District of North Carolina, CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE, for the purpose of executing the aforesaid scheme and artifice to defraud, and attempting to do so, knowingly placed and caused to be placed in any United States Post Office and authorized depository for mail matter, any matter or thing, that is, an envelope containing a NCGA check to ASAP for purported recruiting fees charged by CSI in the amount of $67,360.00 to be delivered to a Post Office box maintained by ASAP in Piney River, Virginia.

56

All in violation of Title 18, United States Code, Sections 1341 and 2.

## COUNT FOURTEEN

1.    Paragraphs 1 through 30 of Count Eleven are hereby re-alleged and incorporated by reference as if fully set forth herein.

2.    On or about March 17, 2011, in the County of Moore, in the Middle District of North Carolina, CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE, for the purpose of executing the aforesaid scheme and artifice to defraud, and attempting to do so, knowingly placed and caused to be placed in any United States Post Office and authorized depository for mail matter, any matter or thing, that is, an envelope containing a NCGA check to ASAP for purported recruiting fees charged by CSI in the amount of $118,000.00 to be delivered to a Post Office box maintained by ASAP in Piney River, Virginia.

All in violation of Title 18, United States Code, Sections 1341 and 2.

## COUNT FIFTEEN

1.    Paragraphs 1 through 30 of Count Eleven are hereby re-alleged and incorporated by reference as if fully set forth herein.

2.    On or about August 10, 2012, in the County of Moore, in the Middle District of North Carolina, CRAIG STANFORD EURY,

57

JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE, for the purpose of executing the aforesaid scheme and artifice to defraud, and attempting to do so, knowingly placed and caused to be placed in any United States Post Office and authorized depository for mail matter, any matter or thing, that is, an envelope containing an ILMC H-2B application package instructing ILMC client Enviro-Scapes, LLC, in Nashville, Tennessee, to pay purported recruiting fees to CSI by mailing payment to ASAP at a Post Office box in Piney River, Virginia.

All in violation of Title 18, United States Code, Sections 1341 and 2.

## COUNT SIXTEEN

1. Paragraphs 1 through 30 of Count Eleven are hereby re-alleged and incorporated by reference as if fully set forth herein.

2. On or about April 1, 2013, in the County of Moore, in the Middle District of North Carolina, CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE, for the purpose of executing the aforesaid scheme and artifice to defraud, and attempting to do so, knowingly placed and caused to be placed in any United States Post Office and authorized depository for mail matter, any matter or thing, that is, an envelope containing a NCGA check to ASAP for purported recruiting fees charged by CSI

58

in the amount of $166,480.00 to be delivered to a Post Office box maintained by ASAP in Piney River, Virginia.

All in violation of Title 18, United States Code, Sections 1341 and 2.

## COUNTS SEVENTEEN THROUGH FORTY

1. Paragraphs 1 through 111 of Count One are hereby re-alleged and incorporated by reference as if fully set forth herein.

2. From on or about November 30, 2009, continuing up to and including on or about September 23, 2013, the exact dates to the Grand Jurors unknown, in the County of Moore, in the Middle District of North Carolina, CRAIG STANFORD EURY, JR., did knowingly engage or attempt to engage in monetary transactions by and through a financial institution affecting interstate and foreign commerce in criminally derived property of a value greater than $10,000.00, that is, the deposit of checks from ASAP on the dates and in the amounts as set forth below into a Branch Banking and Trust account of CRAIG STANFORD EURY, JR., that is, account number          , such property having been derived from a specified unlawful activity, to wit, mail fraud; in violation of Title 18, United States Code, Section 1341:

| COUNT | DATE | CHECK | AMOUNT |
|-------|------|-------|--------|
| 17 | 11/30/09 | # 1183 | $25,000.00 |

59

| 18 | 4/8/10 | # 1193 | $58,000.00 |
|----|--------|--------|-----------|
| 19 | 5/10/10 | # 1200 | $46,180.00 |
| 20 | 6/8/10 | # 1203 | $50,000.00 |
| 21 | 7/20/10 | # 1207 | $34,000.00 |
| 22 | 10/6/10 | # 1212 | $40,000.00 |
| 23 | 12/9/10 | # 1216 | $19,000.00 |
| 24 | 4/6/11 | # 1223 | $35,900.00 |
| 25 | 5/10/11 | # 1230 | $48,000.00 |
| 26 | 6/8/11 | # 1233 | $30,000.00 |
| 27 | 7/8/11 | # 1238 | $50,000.00 |
| 28 | 8/9/11 | # 1242 | $18,000.00 |
| 29 | 10/11/11 | # 1251 | $29,000.00 |
| 30 | 3/14/12 | # 1263 | $16,000.00 |
| 31 | 4/10/12 | # 1266 | $28,000.00 |
| 32 | 5/15/12 | # 1271 | $44,000.00 |
| 33 | 6/11/12 | # 1274 | $38,000.00 |
| 34 | 7/10/12 | # 1279 | $48,000.00 |
| 35 | 9/25/12 | # 1282 | $30,000.00 |
| 36 | 11/13/12 | # 1290 | $40,000.00 |
| 37 | 4/10/13 | #1505 | $48,000.00 |
| 38 | 5/13/13 | # 1510 | $45,000.00 |
| 39 | 7/11/13 | # 1517 | $58,000.00 |
| 40 | 9/23/13 | # 1527 | $48,000.00 |

All in violation of Title 18, United States Code, Section 1957 and 2.

COUNTS FORTY-ONE THROUGH SIXTY-FOUR

1.     Paragraphs 1 through 111 of Count One are hereby re-alleged and incorporated by reference as if fully set forth herein.

2.     From on or about November 30, 2009, continuing up to and including on or about September 23, 2013, the exact dates to the Grand Jurors unknown, in the County of Moore, in the Middle District of North Carolina, HARRY LEE WICKER, JR., did knowingly engage or attempt to engage in monetary transactions by and through a financial institution affecting interstate and foreign commerce in criminally derived property of a value greater than $10,000.00, that is, the deposit of checks from ASAP on the dates and in the amounts as set forth below into a Branch Banking and Trust of North State Governmental Affairs account belonging to HARRY LEE WICKER, JR., that is, account number               ,  such  property  having  been  derived  from  a specified unlawful activity, to wit, mail fraud; in violation of Title 18, United States Code, Section 1341:

| COUNT | DATE | CHECK | AMOUNT |
|-------|----------|--------|-------------|
| 41 | 11/30/09 | # 1185 | $25,000.00 |
| 42 | 4/8/10 | # 1194 | $58,000.00 |

61

| | | | |
|---|---|---|---|
| 43 | 5/10/10 | # 1202 | $46,180.00 |
| 44 | 6/5/10 | # 1205 | $50,000.00 |
| 45 | 7/20/10 | # 1209 | $34,000.00 |
| 46 | 10/6/10 | # 1214 | $40,000.00 |
| 47 | 12/9/10 | # 1218 | $19,000.00 |
| 48 | 4/6/11 | # 1225 | $35,900.00 |
| 49 | 5/10/11 | # 1232 | $48,000.00 |
| 50 | 6/8/11 | # 1235 | $30,000.00 |
| 51 | 7/8/11 | # 1240 | $50,000.00 |
| 52 | 8/9/11 | # 1244 | $18,000.00 |
| 53 | 10/11/11 | # 1250 | $29,000.00 |
| 54 | 3/14/12 | # 1265 | $16,000.00 |
| 55 | 4/10/12 | # 1268 | $28,000.00 |
| 56 | 5/15/12 | # 1273 | $44,000.00 |
| 57 | 6/11/12 | # 1276 | $38,000.00 |
| 58 | 7/10/12 | # 1280 | $48,000.00 |
| 59 | 9/25/12 | # 1284 | $30,000.00 |
| 60 | 4/10/13 | #1504 | $72,000.00 |
| 61 | 5/13/13 | # 1512 | $67,500.00 |
| 62 | 7/11/13 | # 1519 | $11,500.00 |
| 63 | 9/23/13 | #1526 | $52,000.00 |
| 64 | 12/7/13 | # 1538 | $12,000.00 |

62

All in violation of Title 18, United States Code, Sections 1957 and 2.

## COUNTS SIXTY-FIVE THROUGH EIGHTY-SEVEN

1. Paragraphs 1 through 111 of Count One are hereby re-alleged and incorporated by reference as if fully set forth herein.

2. From on or about November 30, 2009, continuing up to and including on or about September 23, 2013, the exact dates to the Grand Jurors unknown, in the County of Moore, in the Middle District of North Carolina, KENNETH W. WHITE did knowingly engage or attempt to engage in monetary transactions by and through a financial institution affecting interstate and foreign commerce in criminally derived property of a value greater than $10,000.00, that is, the deposit of checks from ASAP on the dates and in the amounts as set forth below into State Employees Credit Union account          and account      , in the name of KENNETH W. WHITE, such property having been derived from a specified unlawful activity, to wit, mail fraud; in violation of Title 18, United States Code, Section 1341:

| COUNT | DATE | CHECK | AMOUNT |
|-------|------|-------|--------|
| 65 | 11/30/09 | # 1184 | $25,000.00 |
| 66 | 4/8/10 | # 1192 | $58,000.00 |

63

| 67 | 5/10/10 | # 1201 | $46,180.00 |
|----|---------|---------|------------|
| 68 | 6/8/10 | # 1204 | $50,000.00 |
| 69 | 7/20/10 | # 1208 | $34,000.00 |
| 70 | 10/6/10 | # 1213 | $40,000.00 |
| 71 | 12/9/10 | # 1217 | $19,000.00 |
| 72 | 4/6/11 | # 1224 | $35,900.00 |
| 73 | 5/10/11 | # 1231 | $48,000.00 |
| 74 | 6/8/11 | # 1234 | $30,000.00 |
| 75 | 7/8/11 | # 1239 | $50,000.00 |
| 76 | 8/9/11 | # 1243 | $18,000.00 |
| 77 | 10/11/11 | # 1252 | $29,000.00 |
| 78 | 3/14/12 | # 1264 | $16,000.00 |
| 79 | 4/10/12 | # 1267 | $28,000.00 |
| 80 | 5/15/12 | # 1272 | $44,000.00 |
| 81 | 6/11/12 | # 1277 | $38,000.00 |
| 82 | 7/10/12 | # 1278 | $48,000.00 |
| 83 | 9/25/12 | # 1283 | $30,000.00 |
| 84 | 11/13/12 | # 1291 | $40,000.00 |
| 85 | 4/10/13 | #1506 | $40,000.00 |
| 86 | 5/13/13 | # 1511 | $37,500.00 |
| 87 | 7/11/13 | # 1520 | $89,500.00 |

Case 1:14-cr-00039-JAB   Document 35   Filed 09/30/14   Page 64 of 68

All in violation of Title 18, United States Code, Sections 1957 and 2.

## Forfeiture Allegations

1.    The allegations contained in Counts One through Eighty-Seven of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 8, United States Code, Section 1324(b)(1), Title 18, United States Code, Sections 981(a)(1)(C) and 982(a).

2.    Pursuant to Title 8, United States Code, Section 1324(b)(1), upon conviction of an offense in violation of Title 8, United States Code, Section 1324(a), as alleged in Object Two of Count One [¶ 39.b.], CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR., and KENNETH W. WHITE shall forfeit to the United States of America any conveyance, including any vessel, vehicle, or aircraft, that has been or is being used in the commission of the violations of which the defendant is convicted, the gross proceeds of such violations, and any property traceable to such conveyance or proceeds.

3.    Pursuant to Title 18, United States Code, Section 982(a)(6), upon conviction of an offense in violation of Title 8, United States Code, Section 1324(a), or Title 18, United States Code, Section 1546, as alleged in Object Three of Count One [¶ 39.c.], CRAIG STANFORD EURY, JR., HARRY LEE WICKER, JR.,

65

and KENNETH W. WHITE shall forfeit to the United States of America:

(a)  any conveyance, including any vessel, vehicle, or aircraft used in the commission of the offense of which the defendant is convicted; and

(b) any property, real or personal--

(i)  that constitutes, or is derived from or is traceable to the proceeds obtained directly or indirectly from the commission of the offense of which the defendants are convicted; or

(ii)  that is used to facilitate, or is intended to be used to facilitate, the commission of the offense of which the defendants are convicted.

4.  Pursuant to Title 18, United States Code, Section 982(a)(1), upon conviction of an offense in violation of Title 18, United States Code, Section 1957, as alleged in Object Four of Count One [¶ 39.d.], Counts Two through Ten, and Counts Seventeen through Eighty-Seven, the defendants shall forfeit to the United States of America any property, real or personal, involved in such offense, or any property traceable to such property.

66

5. Pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 18, United States Code, Section 2461(c), upon conviction of an offense in violation of Title 18, United States Code, Section 1341, as alleged in Counts Eleven through Sixteen, the defendants shall forfeit to the United States of America any property, real or personal, which constitutes or is derived from proceeds traceable to the offense of which the defendants are convicted.

6. The property to be forfeited includes, but is not limited to, a sum of money equal to $3,842,240.00 or more, representing the total amount forfeitable as a result of such offenses.

7. If any of the property described above, as a result of any act or omission of a defendant:

      a. cannot be located upon the exercise of due diligence;

      b. has been transferred or sold to, or deposited with, a third party;

      c. has been placed beyond the jurisdiction of the court;

      d. has been substantially diminished in value; or

      e. has been commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code,

67

Section 982(b)(1), and Title 28, United States Code, Section 2461(c).

All pursuant to Title 8, United States Code, Section 1324(b)(1), Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(1), and 982(a)(6), Rule 32.2(a), Federal Rules of Criminal Procedure, and Title 28, United States Code, Section 2461(c).

A TRUE BILL:

FRANK J. CHUT, JR.
ASSISTANT UNITED STATES ATTORNEY

RIPLEY RAND
UNITED STATES ATTORNEY