IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | |
| CRAIG STANFORD EURY, JR. | : | 1:14CR39-1 |
| HARRY LEE WICKER, JR. | : | 1:14CR39-4 |
| KENNETH W. WHITE | : | 1:14CR39-5 |

GOVERNMENT'S RESPONSE TO DEFENDANTS' MOTION TO SUPPRESS

NOW COMES the United States of America, by and through Ripley Rand, United States Attorney for the Middle District of North Carolina, in response to the defendants' motion to suppress and states to the court the following:

INTRODUCTION

The defendants advance a series of creative arguments in their motion to suppress, but it is telling that they do not cite to a single controlling case—from either the U.S. Supreme Court, the Fourth Circuit, or the cases of this District—that supports their requested relief.[1] Indeed, it is difficult to discern what exactly the defendants wish the Court to do, as their only request is for the blanket suppression of "any and all witness testimony" from an unspecified set of witnesses. Regardless, it is clear that the defendants' motion should be

---

[1] Defendants cite to several Supreme Court cases, but only for general principles of law.

denied for several reasons: First, the defendants mistakenly apply Title 26 to this case, which is not a tax case. Second, the defendants imagine the existence of "de facto summonses," but the facts indicate only letters seeking an interview, to which some witnesses voluntarily consented while others declined without consequence. Third, the defendants lack standing to object to the third-party witness interviews. Fourth, the defendants have not made a showing sufficient for the Court to employ its supervisory power to suppress evidence.

ARGUMENT

Before addressing the defendants' specific arguments, it is important to note the only two suggested sources for the relief they seek: (1) the Fifth Amendment's protection against involuntary confessions, and (2) the Court's general supervisory power to remedy prosecutorial misconduct. (Defs.' Mot. at 6-7.) The leap required to connect these potential sources of relief to the facts of this case—voluntary interviews of third-party witnesses that included a hypothetical question—is substantial.

The defendants advance two discrete arguments in their motion, neither of which has any merit. First, the defendants argue that IRS Special Agent Thomas ("SA Thomas") sent letters to members of the North Carolina Growers Associations ("NCGA") that were unlawful because they amounted to "de facto

2

summonses." Second, they argue that IRS Special Agents Backstrom and Hicks ("SA Backstrom" and "SA Hicks") violated "fundamental ethical standards" by asking a single hypothetical question in four witness interviews. Neither argument has merit.

I. <u>SA Thomas's Letters Do Not Violate the Fifth Amendment, and the Court Should Not Use Its Supervisory Power to Suppress any Evidence.</u>

   A. <u>Title 26 does not apply to this case.</u>

The defendants' first argument——that SA Thomas's letters were "de facto summonses" under 26 U.S.C. § 7602——ignores a critical fact: this is not a tax case under Tile 26. Title 26 authorizes the Secretary of the Treasury and the Attorney General to commence a *civil* action "for the collection or recovery of taxes, or of any fine, penalty, or forfeiture." 26 U.S.C. § 7401. In such an action, IRS agents have a number of options for gathering evidence, including the issuance of summonses for testimony and documents regarding tax liability. § 7602(a). Clearly, however, the purpose of these summonses is to "inquir[e] into any offense connected with the administration or enforcement of the internal revenue laws." § 7602(b).

The government's case against the defendants is and always has been a criminal action under Titles 8 and 18.[2] As such,

---

[2] Specifically, the grand jury charged the defendants with violating 8 U.S.C. § 1324(a)(1)(A)(v)(I) and 18 U.S.C. §§ 2, 371-72, 1341-42, 1957.

3

Title 26 does not apply. It is not uncommon for IRS agents to assist with investigations into allegations of money laundering, and that is exactly what the special agents did in this case by sending letters to various potential witnesses and interviewing those who responded in an open, transparent, and completely voluntary manner. Nothing in the applicable criminal statutes or the U.S. Constitution prohibited them from doing so.

Accordingly, as a threshold matter, the defendants' arguments regarding 26 U.S.C. § 7602 are without merit.

B. SA Thomas's letters did not compel the production of evidence.

Assuming Title 26 applied, the defendants' next argument is that SA Thomas's letters were "de facto summonses" because they were "unambiguously compulsory." (Dfs.' Mot. at 10.) The defendants' theory is inconvenienced by the following facts:

- The special agents contacted the potential witnesses/victims (who were farmers) and explained that their cooperation was not mandatory.
- Many farmers did not want to cooperate with the special agents or could not meet because of commitments they had on their farms.
- There were no consequences, threatened or actual, to those farmers who would not or could not meet.

4

- The special agents only interviewed those farmers who were willing to come at the appointed time, or who were willing to make alternative arrangements.[3]

In the Ninth Circuit case upon which the defendants rely (which was a tax case under Title 26), the court noted the following about the letters in question, "A number of recipients elected not to respond, evidently understanding that response was voluntary." *Speck v. United States*, 59 F.3d 106, 109 (9th Cir. 1995). In this case, the fact that many of the farmers who received letters decided not to meet with the agents indicates their understanding that a response was voluntary.

Finally, courts have held that IRS agents may send letters under 26 U.S.C. § 7602(1) with much stronger language than SA Thomas used here. For example, in *United States v. Barksdale*, 499 F. Supp. 624, 628 (M.D. Fla. 1980), the court found that an IRS letter was reasonable under § 7602(1) even though it contained the following statement: "The above information is required under the Authority of Section 7602, Internal Revenue Code. A response is required, even if negative."

Accordingly, because SA Thomas's letters did not improperly coerce anyone, the defendants' motion should be denied.

---

[3] The agents are available to testify concerning these facts should the Court find it necessary to further explore this issue.

5

### C. The defendants lack standing to contest the alleged coercion of third-party witnesses.

Even assuming SA Thomas's letters amounted to "coercion," which the government denies, the Fifth Amendment does not provide a remedy because the defendants lack standing to object to statements from third-party witnesses. The United States Supreme Court addressed this issue at length in a tax case in which the IRS issued a summons to the taxpayer's accountant:

> The question is whether the taxpayer may invoke her Fifth Amendment privilege against compulsory self-incrimination to prevent the production of her business and tax records in the possession of her accountant.
>
> . . . .
>
> The importance of preserving inviolate the privilege against compulsory self-incrimination has often been stated by this Court and need not be elaborated. By its very nature, the privilege is an intimate and personal one. It respects a private inner sanctum of individual feeling and thought and proscribes state intrusion to extract self-condemnation. Historically, the privilege sprang from an abhorrence of governmental assault against the single individual accused of crime and the temptation on the part of the State to resort to the expedient of compelling incriminating evidence from one's own mouth.
>
> . . . .
>
> It is important to reiterate that the Fifth Amendment privilege is a personal privilege: it adheres basically to the person, not to information that may incriminate him. As Mr. Justice Holmes put it: "A party is privileged from producing the evidence, but not from its production." The Constitution explicitly prohibits compelling an

6

> accused to bear witness "against himself": it necessarily does not proscribe incriminating statements elicited from another. . . . It is extortion of information from the accused himself that offends our sense of justice.
>
> In the case before us the ingredient of personal compulsion against an accused is lacking. The summons and the order of the District Court enforcing it are directed against the accountant. He, not the taxpayer, is the only one compelled to do anything. . . .
>
> The divulgence of potentially incriminating evidence against petitioner is naturally unwelcome. But petitioner's distress would be no less if the divulgence came not from her accountant but from some other third party with whom she was connected and who possessed substantially equivalent knowledge of her business affairs. The basic complaint of petitioner stems from the fact of divulgence of the possibly incriminating information, not from the manner in which or the person from whom it was extracted. Yet such divulgence, where it does not result from coercion of the suspect herself, is a necessary part of the process of law enforcement and tax investigation.

*Couch v. United States*, 409 U.S. 322, 323, 327-329 (1973) (citations omitted); *see also In re Grand Jury Subp. John Doe*, 584 F.3d 175, 185 (4th Cir. 2009) ("[C]ompelling the production of documents in possession of a third person generally does not contravene the Fifth Amendment."); *Streett v. United States*, 65 F. Supp. 2d 383, 385 (W.D. Va. 1999) ("[T]he Fifth Amendment does not protect against incriminating statements elicited from other parties."). Here, as in *Couch*, the defendants are understandably unsettled that third parties have provided

7

evidence unfavorable to them. The Fifth Amendment, however, does not allow them to avoid that evidence.

Furthermore, in the *Barksdale* case cited above the court explained why a defendant lacks standing to object to materials produced by third parties pursuant to IRS letters:

> [E]ven if the wording of the letters did in fact constitute an unlawful compulsion upon its recipients to provide information to the IRS, the Defendant lacks standing to object. By the defendant's own analysis, this is not a summons enforcement proceeding in which a taxpayer can intervene under certain circumstances to challenge the validity of summonses issued to third parties. Thus, the Defendant had no protectable Fourth or Fifth Amendment Constitutional interest in any of the information obtained from third parties by means of the circular letters, and therefore cannot object to the manner in which it was collected.

*Barksdale*, 499 F. Supp. at 629. Here, as in *Barksdale*, the defendants could not have intervened to challenge SA Thomas's letters (because this is not a tax case), and they lack standing to object to any evidence obtained as a result of those letters.[4]

Accordingly, the Court should deny the defendants' motion.

D. <u>The Court should not employ its supervisory power to suppress any evidence.</u>

Other than the Fifth Amendment, the only doctrine invoked by the defendants is the Court's supervisory power. As stated

---

[4] Some courts do question the reliability of evidence coerced from third parties and treat the issue not through an exclusionary rule, but by determining if the evidence is reliable in light of other available evidence. *See, e.g.*, *Samuel v. Frank*, 525 F.3d 566, 569 (7th Cir. 2008). Such a determination would need to be made at trial.

by the Fourth Circuit, "The invocation of supervisory power to exclude evidence from a criminal trial in order to remedy a government agent's violation of statutory authority in a criminal investigation is an extreme measure that must be reserved for cases involving 'severe official misconduct.'" *United State v. Sanders*, 104 Fed. App'x 916, 923 (4th Cir. 2004). The Court should not use that power here for at least four reasons.

First, it is unclear that the Court's supervisory power even extends to this situation. *See United States v. Payner*, 447 U.S. 727, 735 (1980) ("We conclude that the supervisory power does not authorize a federal court to suppress otherwise admissible evidence on the ground that it was seized unlawfully from a third party not before the court."); *Sanders*, 104 Fed. App'x at 921 (rejecting exclusionary remedy when "a government agent involved in the criminal investigation exceeded his authority").

Second, there simply has not been any prosecutorial misconduct here. SA Thomas sent letters to a number of farmers who were potential witnesses/victims. Some of these farmers agreed to meet with and talk to the agents, while many others did not. These facts do not support a charge of prosecutorial

9

by the Fourth Circuit, "The invocation of supervisory power to exclude evidence from a criminal trial in order to remedy a government agent's violation of statutory authority in a criminal investigation is an extreme measure that must be reserved for cases involving 'severe official misconduct.'" *United State v. Sanders*, 104 Fed. App'x 916, 923 (4th Cir. 2004). The Court should not use that power here for at least four reasons.

First, it is unclear that the Court's supervisory power even extends to this situation. *See United States v. Payner*, 447 U.S. 727, 735 (1980) ("We conclude that the supervisory power does not authorize a federal court to suppress otherwise admissible evidence on the ground that it was seized unlawfully from a third party not before the court."); *Sanders*, 104 Fed. App'x at 921 (rejecting exclusionary remedy when "a government agent involved in the criminal investigation exceeded his authority").

Second, there simply has not been any prosecutorial misconduct here. SA Thomas sent letters to a number of farmers who were potential witnesses/victims. Some of these farmers agreed to meet with and talk to the agents, while many others did not. These facts do not support a charge of prosecutorial

9

misconduct, something made clear by studying the egregious facts in the cases cited by the defendants:

- In *United States v. Omni Intern. Corp.*, 634 F. Supp. 1414, 1438 (D. Md. 1986), the court stated that its supervisory power "should be exercised sparingly and only on a showing of demonstrated and longstanding prosecutorial misconduct." It used the power to dismiss an indictment without prejudice, but only because of a "consistent course of entrenched and flagrant misconduct," including "the alteration and creation of documents, false and incorrect testimony, and a lack of candor in colloquies with and testimony before the Court." *Id*. at 1440, 1446.

- In *United States v. Samango*, 607 F.2d 877, 883-84 (9th Cir. 1979), the court affirmed use of the supervisory power to dismiss an indictment when the prosecutor gave the grand jury a witness transcript that "served no other purpose than calculated prejudice," another transcript that was "deceiving," and presented live testimony from an agent who lacked knowledge of the events he described. The court affirmed use of the power because of the "cumulative effect of the above errors and indiscretions." *Id*. at 884.

10

- In *United States v. Stein*, 495 F. Supp. 2d 390, 393 (S.D.N.Y. 2007), the court used the power to dismiss an indictment because the government "coerced KPMG to limit and then cut off its payment of the legal fees of KPMG employees," thereby leaving "four of them deprived of counsel of their choice and most of the others unable to afford the defenses that they would have presented absent the government's interference."

- In *United States v. Chapman*, 524 F.3d 1073, 1085 (9th Cir. 2008), the court exercised the power to dismiss an indictment after the prosecutor failed to turn over *Brady* and *Giglio* material and then made "affirmative misrepresentations to the court of full compliance" even though he had "received several indications, both before and during trial, that there were problems with its discovery production."

It is simply not reasonable for the defendants to compare the facts in the *Omni*, *Samango*, *Stein*, and *Chapman* cases with SA Thomas's letters, sent to a group of farmers who clearly, by their conduct, understood them to request a voluntary meeting.

Third, even if there is some element of misconduct here, which the government denies, it is "essentially technical" and therefore not sufficient for the Court to employ the supervisory

11

power.  *United States v. Neiswender*, 590 F.2d 1269, 1272 (4th Cir. 1979).  The Fourth Circuit has reserved that power for situations of "severe official misconduct born of malice, caprice or brazen lawlessness." *Id*.  Here, the defendants' complaint boils down to a strongly worded letter, hardly a malicious, capricious, or brazen act.  Perhaps recognizing this weakness, the defendants make yet a farther leap, arguing that SA Thomas "covered up" his actions.  This allegation is absurd.  All of the Memoranda of Interviews from the relevant interviews are in the government's prosecutorial file, which has been open to the defendants since the date of the indictment[5].

Finally, there is no indication that SA Thomas was not acting in good faith.  As the Supreme Court has recognized, to invoke an exclusionary rule "when law enforcement officers have acted in objective good faith or their transgressions have been minor" confers a disproportionate benefit on defendants and "offends basic concepts of the criminal justice system." *United States v. Leon*, 468 U.S. 897, 908 (1984).[6]

In sum, the defendants' arguments regarding SA Thomas's letters lack merit, and the Court should deny their motion.

---

[5] Two additional memorandum of interviews which were not in the prosecutorial file are being made available to defendants Eury and White and have already been provided to Wicker.
[6] Again, the agents involved are available to testify if the Court wishes.

12

## II. SA Backstrom and SA Hicks' Hypothetical Question Does Not Violate any Applicable Law.

Other than SA Thomas's letters, the defendants take issue with the fact that SA Backstrom and SA Hicks asked a hypothetical question in four witness interviews. Many of the arguments stated above apply here as well. In addition, perhaps the best demonstration that this is not the stuff of suppression is the defendants' citations: three state court cases from 1990, 1911, and 1880, and a law review article, none of which deal with hypothetical questions. (Defs.' Mot. at 13-14.)

Viewed within its context, there was simply nothing wrong with the question SA Backstrom and SA Hicks posed to these witnesses. They asked, "[I]f the directors of NCGA were receiving any profit above their salary, in violation of the NCGA Articles of Incorporation, would [the witness] consider that a violation of trust." (Defs.' Mot. at 14.) It is unclear whether this question, *if asked at trial*, would be a permissible hypothetical or a guilt-assuming hypothetical. *See United States v. Dukes*, 242 Fed. App'x 37, 45-46 (4th Cir. 2007). But federal agents investigating criminal activity are bound by the U.S. Constitution, not the federal rules of evidence. To impose every contour of the federal rules of evidence on federal agents would be unrealistic and often inappropriate. SA Backstrom and SA Hicks simply wanted to know whether these victims thought it

13

would be a violation of trust for NCGA directors to receive profit above their salary. That only two witnesses answered affirmatively, while one declined to comment and another answered negatively, demonstrates that the agents asked a fair question in a fair manner, and did not "unlawfully persaud[e]" anyone of anything. (Defs.' Mot. at 12.)

## CONCLUSION

For the reasons stated above, the United States respectfully requests that the Court deny the defendants' motion to suppress.

This the 12th day of February, 2015.

                          Respectfully submitted,

                          RIPLEY RAND
                          United States Attorney

                          /S/ STEVEN N. BAKER
                          Assistant United States Attorney
                          NCSB # 36607

                          /S/ FRANK J. CHUT, JR.
                          Assistant United States Attorney
                          NCSB # 17696
                          United States Attorney's Office
                          Middle District of North Carolina
                          101 S. Edgeworth St., 4th Floor
                          Greensboro, NC  27401
                          Phone:  336/333-5351

CERTIFICATE OF SERVICE

I hereby certify that on February 12, 2015, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, and I will send notification of such filing to the following:

Kearns Davis, Esq.
Wade Smith, Esq.
Lisa Costner, Esq.

/S/ FRANK J. CHUT, JR.
Assistant United States Attorney
NCSB #17696
United States Attorney's Office
Middle District of North Carolina
P.O. Box 1858
Greensboro, NC 27402
Phone: 336/333-5351